# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

MARSHALL CARO and INDII.com USE,
LLC

               Plaintiffs,

   v.

FIDELITY BROKERAGE SERVICES,
KATHERINE HO,
BILL ROTHFARB,
EVAN ROTHFARB,
MICHAEL SHANNON, and
MICHAEL HOENIG

              Defendants.

3:14-CV-01028 (CSH)

**April 30, 2015**

## RULING ON MOTIONS TO DISMISS

**HAIGHT**, Senior District Judge:

Plaintiffs Marshall Caro, *pro se*, and Indii.com USE ("Indii") bring this diversity action seeking damages arising from Defendants' allegedly unlawful restraint of Indii's Fidelity Brokerage account. Defendants are Bill Rothfarb, a judgment creditor, his attorney, Evan Rothfarb (the "Rothfarb Defendants") Fidelity Brokerage Services ("Fidelity"), the custodian of the Indii account, Katherine Ho, a Fidelity employee, and Michael Shannon and Michael Hoenig, Fidelity's attorneys (the "Fidelity Defendants").

The complaint sets forth claims arising under state common and statutory law. The Rothfarb Defendants and the Fidelity Defendants have filed separate motions to dismiss the complaint. Docs. [25] and [37]. Each set of defendants moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted and is barred by the doctrines of res judicata and collateral estoppel. The Fidelity

Defendants also move to dismiss the complaint for lack of personal jurisdiction over Ho, Hoenig and Shannon, pursuant to Federal Rule of Civil Procedure 12(b)(2).  Plaintiffs oppose Defendants' motions to dismiss.  The motions are ripe for adjudication.  This Ruling decides them.

## I.   BACKGROUND

The following facts are derived from the allegations of Plaintiffs' amended complaint, doc. [6-1], and from court records of the priors litigations between the parties, which have been filed by Defendants in support of their respective motions to dismiss and specifically, their arguments that the complaint should be dismissed on the grounds of res judicata and collateral estoppel.  In that latter regard, it is well-settled that the Court is entitled to take judicial notice of court records in evaluating a motion to dismiss.  *See, e.g., Ambase Corp v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72-72 (2d Cir. 2003*); Kramer v. Time Warner, Inc*., 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts").  We recount the history of prior litigations and recite the complaint's well-pleaded allegations in order to evaluate the viability of Plaintiffs' claims, and Defendants' defenses, under the governing law.

## A.   Bill Rothfarb wins Judgment in New York State Supreme Court (Moskowitz, J.)

The present action is the latest installment in a dispute between Marshall Caro and Bill Rothfarb three decades in the making.  It begins with a judgment Bill Rothfarb won against Caro in March 1995 in New York State Supreme Court (Moskowitz, J.).  The facts culminating in that judgment are recounted below. They are derived from that court's Decision After Trial, dated May 11, 1993. Doc. [29-1]; *see Bill Rothfarb v. Programit, Inc. et al*., Index No. 19178/87 (Sup. Ct. New York County May 11, 1993).

In February 1985, Bill Rothfarb was hired as a salesman by Programit, Inc. ("Programit"),

a company in the "package computer software business" formed by Caro and other business associates.  *Id.* at 1-2.  When Caro terminated Bill Rothfarb's employment two years later, Bill Rothfarb filed the action in New York State Supreme Court (Moskowitz, J.) against Caro and his business partners, Programit, and several named "successor corporations" of Programit, seeking to recover sales commissions owed to him pursuant to the sales compensation agreement he entered with Caro and Programit.  *Id.* at 2, 4.  Following a six-day bench trial, the court issued a decision finding that Bill Rothfarb "was credible and knowledgeable of the issues," while Caro "not credible," "his testimony unclear and contradictory," *id.* at 4, and his conduct reflective of a "cavalier use" and "blatant disregard of the corporate form," *id.* at 5-6.  The court concluded that Bill Rothfarb was entitled to certain unpaid sales commissions, a two percent equity interest in Programit (and its successor corporations), and reasonable attorneys' fees.  *Id.* 6-7, 10-11.  The court held that Caro was jointly and severally liable for Bill Rothfarb's damages, and, in keeping with New York practice, ordered the parties to "settle judgment in accordance with the foregoing conclusions of fact and law."  *Id.* at 6, 11.  On March 28, 1995, in accordance with its Decision After Trial, the court entered a final Judgment and Order in favor of Bill Rothfarb in the amount of $204,018.23 "plus capital stock equal to a 2% equity interest" in Programit and its successor corporations (hereinafter, the "New York Judgment").  Doc. [29-2]; *Bill Rothfarb v. Programit, Inc. et al*., Index No. 19178/87 (Sup. Ct. New York County March 28, 1995).

**B.**      **Bill Rothfarb Domesticates New York Judgment in Connecticut**

Caro did not satisfy the New York judgment until after Bill Rothfarb resumed efforts, some fifteen years later, to collect on it.  In March 2010, Bill Rothfarb, through his attorney, Evan Rothfarb, moved to domesticate the New York Judgment in Connecticut pursuant to the Uniform

3

Enforcement of Foreign Judgments Act (UEFJA), General Statutes § 52-604 *et seq.*, by filing a certified copy of the Judgment in the Connecticut Superior Court for the Judicial District of Norwalk/Stamford, Docket No. FST-CV10-4018360-S.  Doc. [29-4]; Doc. [29-7] at 2.  On March 18, 2010, in accord with the New York Judgment, the Clerk of the Connecticut Superior Court entered judgment in favor of Bill Rothfarb in the amount of $204,018.23.  Doc. [29-7] at 3, 13.  Shortly thereafter, Bill Rothfarb recorded a judgment lien in the amount of $475,006.92 on Caro's property in Greenwich, Connecticut.  The value of the judgment lien reflected the value of the domesticated judgment plus post-judgment interest.  Doc. [6-1] at 6 ¶ 31; Doc. [39-3] at 2-3.

On May 5, 2010, Caro filed a motion in Connecticut Superior Court to set aside the judgment, claiming principally that Bill Rothfarb docketed the New York Judgment by fraud by failing to comply with New York's procedural requirements for settling judgments.  In that regard, Caro claimed that the judgment was procedurally improper because Bill Rothfarb did not serve Caro with a proposed judgment and did not file the proposed judgment within sixty days of the court's order to "settle judgment."  Doc. [29-5] at 8-12.  Those procedural defects, in Caro's estimation, meant that the "purported New York Judgment was docketed by fraud and [was] therefore not entitled to enforcement in Connecticut."  *Id.* at 11 (emphasis omitted).  Caro claimed moreover that he "was unaware of the existence of [the] 'judgment'" until Rothfarb sought to domesticate it in Connecticut.  *Id.*

In a Memorandum of Decision dated September 21, 2010, the Connecticut Superior Court (Brazzel-Massaro, J), rejected Caro's argument that the New York Judgment had been docketed by fraud, finding that service of the proposed judgment had been properly effected on Caro or his attorney and that the proposed judgment was not rendered null by its late filing.  Doc. [29-7] at 8-11.

Noting also that the record revealed that "Caro's counsel was served with the notice of entry of judgment on March 29, 1995 and that Caro commenced an appeal to the Appellate Division, First Department on April 27, 1995," the court stated that it was "disingenuous for Caro to argue that he did not have notice of the underlying New York Judgment until [Bill Rothfarb] sought to domesticate the judgment in Connecticut." *Id.* Accordingly, the court denied Caro's motion to set aside the domesticated judgment. *Id.* at 14.

**C.**    **Bill Rothfarb Serves Restraining Notices on Fidelity to Restrain the Indii Account**

On or about July 16, 2010, Bill Rothfarb, through his attorney Evan Rothfarb, sent a letter to Fidelity informing Fidelity of the New York Judgment. Doc. [49] at 2-3. Enclosed with the letter were copies of a Restraining Notice and Information Subpoena ("first restraining notice" or "July 2010 restraining notice") directing Fidelity to restrain and identify accounts in which Caro had an interest. Docs. [20-8-], [29-25] at 3.

On July 27, 2010, Fidelity wrote to Evan Rothfarb confirming that Caro had an interest in the Indii account. Doc. [29-9]. On July 30, 2010, Fidelity sent a letter to Evan Rothfarb indicating that it had determined that the Indii account might be exempt from the restraining notice and stating that it would remove the restraint on the Indii account not later than August 5, 2010, unless it received a court order, restraining order, or other process from a court of competent jurisdiction directing it to continue the restraint. Doc. [29-25] at 3; Doc. [29-14] at ¶ 20. On or about August 2, 2010, Fidelity received a letter from Evan Rothfarb formally objecting to the removal of the restraint on the Indii account and threatening Fidelity with contempt proceedings if it did not continue the restraint. *Id.*; Doc. [29-14] at ¶ 21. On August 3, 2010, Fidelity received a letter from Donna Drumm, counsel for Indii, stating Indii's objection to the restraint on the Indii account and

informing Fidelity of its intention to file exemptions to the restraining notice.  *Id.*;  Doc. [29-14] at ¶ 22.

**D.**   **Bill Rothfarb Moves for an Order to Show Cause in New York State Supreme Court (Gische, J.).**

Based on Fidelity's representation that it would remove the restraint on the Indii account unless it received a court order directing the continued restraint of the account, Bill Rothfarb, on or about August 6, 2010, obtained a temporary restraining order from the New York State Supreme Court (Gische, J.) prohibiting Fidelity from lifting the restraint on the Indii account until an Order to Show Cause hearing could be held in that court on August 26, 2010, to determine whether the court would, *inter alia*, enjoin Fidelity from lifting the restraint on the account.  Doc. [29-10]; *see* [29-21] at 7.  During the Order to Show Cause hearing, Fidelity, through its attorney Michael Shannon, and Bill Rothfarb, through his attorney, Evan Rothfarb, advised the court of a written stipulation between Fidelity and Bill Rothfarb, whereby Fidelity would agree not object to the court's continuation of an injunction on the Indii account, or in the alternative, would agree to accept service of a second restraining notice.  Doc. [29-10]; Doc. [29-11] at 2-3; [29-12].  Shannon and Evan Rothfarb also advised the court that Fidelity had recently filed an interpleader complaint in the United States District Court for the Southern District of New York (Jones, J.), and that Fidelity and Bill Rothfarb were seeking a court order to continue the soon-to-expire restraint on the Indii account until such time as the federal district court could rule on Fidelity's complaint in the interpleader proceeding.  [29-11] at 9-11.  The court resolved that it could not issue a preliminary injunction continuing the restraint on the Indii account; however, it directed Evan Rothfarb to serve a second restraining notice on Fidelity ("second restraining notice" or "August 2010" restraining notice).  *Id.*

at 11.  The court closed the hearing, noting "that there is going to be a Federal interpleader and the restraint that is involved [will] lapse and [a] new restraint will be served."  *Id.* at 12.  Accordingly, the court marked the Order to Show Cause "resolved as per [the Rothfarb-Fidelity] stipulation."  Doc. [29-12].

## E.      Fidelity Seeks  Interpleader Relief in the United States District Court for the Southern District of New York (Jones, J.)

As indicated above, Fidelity on August 4, 2010, filed an interpleader complaint in the United States District Court for the Southern District of New York (Jones, J.), naming Bill Rothfarb, Caro and Indii as defendants.[1]  On September 8, 2010, the court issued an Order to Show Cause, directing, Fidelity to deposit the funds of the Indii account into the Registry of the Court, and Plaintiffs to show cause why an order should not issue granting Fidelity's request for interpleader relief.  Doc. [29-18] at 5.

On November 24, 2010, the court issued a Memorandum and Order granting Fidelity's request for interpleader relief and dismissing Fidelity from the action.[2]  Doc. [29-18] at 6.  The court observed that "the amount of the funds deposited into the Registry of the Court — approximately $769,000 — exceeds the amount of Rothfarb's judgment against Caro, which is approximately $486,000."  *Id.*  Accordingly, the court directed the parties to "inform the Court . . . the amount, if

---

[1] Fidelity also named Walter Raquet a defendant in the interpleader action.  Fidelity believed Raquet to have a minority interest in the Indii account.  His involvement in the interpleader action is not material to the present action.

[2] In our related Ruling reported at *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv01066 (CSH), 2014 WL 3907920, *2 (D. Conn. Aug. 11, 2014), we indicated that the United States District Court for the Southern District of New York (Jones, J) granted Fidelity interpleader relief in a Memorandum and Order dated November 23, 2010.  On the present record, it is clear that though that decision was signed on that date, it was filed on November 24, 2010.  Doc. [29-18] at 1.

any, of the interpleaded funds that should be released from the Registry of the Court." *Id.* at 6.

Shortly thereafter, in late November 2010, Caro informed the court that he remitted payment to Bill

Rothfarb, satisfying the monetary portion of the New York Judgment. Doc. [39-1] at 2; Doc. [39-2]

at 1. On April 22, 2011, the court issued a Memorandum and Order, directing the clerk of court to

release the funds of the Indii account in light of Caro's representation that he "satisfied the underlying

judgment to Bill Rothfarb." Doc. [39-1] at 2-3.

**F.**      **Plaintiffs File an Action before the Financial Industry Regulatory Authority**

On January 23, 2011, Plaintiffs filed against Fidelity an arbitration claim before a three-

member panel of FINRA ("arbitration panel"), seeking damages arising from Fidelity's restraint of

the Indii account and the interpleader action. Doc. [29-19]. In Caro's statement of claim, and

amended statement of claim, which he filed *pro se* and in his capacity as representative of Indii, Caro

restated his allegations that Bill Rothfarb obtained the New York Judgment fraudulently, that

Fidelity's acceptance of the August 2010 restraining notice was improper, and also argued that

Fidelity breached the arbitration clause of its customer agreement with Caro and Indii by filing the

interpleader action. Doc. [29-19] at 2; Doc. [29-20] at 2; *see* Doc. [29-25] at 5. Based on those

allegations, Caro sought for both himself and Indii "compensatory damages" (i.e., reimbursement

for  "monies Caro paid to Rothfarb" and a total restoration of the Indii account), "attorneys' fees"

(arising from pre-arbitration litigation) and "punitive damages to punish Fidelity for [its] tortious

behavior." Doc. [29-19] at 3; Doc. [29-20] at 3; *see* Doc. [29-25] at 5. Caro reiterated his

entitlement to damages and expanded upon his allegations against Fidelity in his pre-hearing brief,

dated February 23, 2012. Doc. [29-21].

Following a four day hearing held in March 2012, the arbitration panel rendered an award,

8

dated April 24, 2012, denying Caro and Indii's claims in their entirety, and awarding Fidelity $30,000 in attorneys' fees incurred during the arbitration proceeding.  Doc. [29-22]; *see Indii.com USE, LLC and Marshall Caro v. Fidelity Brokerage Services, LLC*, Docket No. 11-00298 (decided 4/24/2012).

**G.     Plaintiffs move this Court to vacate the FINRA Arbitration Award**

On July 12, 2012, following the denial of his claims by the arbitration panel, Caro, appearing *pro se* and on behalf of Indii, filed a self-styled "Complaint and Petition" in this Court, petitioning the Court pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10 to vacate the award of the arbitration panel.  Fidelity filed a motion to confirm the award pursuant to Rule 9 of the FAA, 9 U.S.C. § 9.  Plaintiffs alleged that the arbitration panel was biased against Caro and his expert, exceeded its powers in awarding attorneys' fees, was guilty of misconduct by committing certain evidentiary and procedural errors during the arbitration, and demonstrated a manifest disregard of the law.  Doc. [29-25] at 7-8.  In that latter regard, Plaintiffs claimed that the arbitrators erred, by not finding that Fidelity improperly restrained the Indii account, by not finding that the August 2010 restraining notice was served without leave of court, and by not finding that Fidelity breached the parties' agreement to arbitrate, which was set forth in account agreements with Caro and Indii.  *Id.* at 8-10.

In a Ruling dated August 11, 2014, this Court concluded that the arbitration panel exceeded its powers in awarding Fidelity attorneys' fees for the arbitration proceedings, but that the award was otherwise not improper.  *Id.* at 7-24.  Accordingly we vacated the attorneys' fees portion of the award, and confirmed it in all other respects.  *Id.* at 24; *see Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv01066 (CSH), 2014 WL 3907920, at *14 (D. Conn. Aug. 11, 2014).

9

**H.**    **Caro Seeks Relief in Connecticut Superior Court (Mottolese, J.)**

While the parties' cross-motions to vacate and confirm the arbitration panel award were pending in this Court, Caro filed a motion in Connecticut Superior Court (Mottolese, J.), dated October 1, 2012, requesting a determination that the domesticated New York Judgment had been satisfied in full, as well as an order directing Bill Rothfarb to discharge the judgment lien secured on Caro's property.  Doc. [39-3] at 5.  Caro, appearing through counsel, maintained that he satisfied the New York Judgment by furnishing Bill Rothfarb with a cashier's check in the amount of $491,767,78 on November 26, 210 (two days after the federal district court granted Fidelity's request for interpleader), and that Bill Rothfarb failed to release the judgment lien in contravention of Conn. Gen. Stats. §§ 49-51, *et seq*., and 52-380g, *et. seq.*,which require a judgment creditor to release a judgment lien upon satisfaction of a judgment.  Doc. [39-3] at 4-9.

In an Order dated, April 3, 2013, the court (Mottolese, J.) denied Caro's motion for a declaratory judgment that the judgment had been satisfied in full, concluding that when the New York Judgment was domesticated in Connecticut in March 2010, "the *entire* judgment [was left] intact including [Caro's] contingent obligation to make good on the 2% capital stock."  Doc. [39-4] (emphasis added).  The court, however, granted Caro's motion to release the judgment lien, concluding that Caro was entitled to an "unconditional release" because the judgment lien filed by Bill Rothfarb "made no reference to the stock transfer part of the judgment"; rather, referred only to a  a "specific monetary sum" that had "been paid in full."  *Id.*  The court subsequently denied Caro's motion to reargue in a Memorandum of Decision dated June 3, 2013.  Doc. [39-6].

**I.**    **Plaintiffs File the Present Action**

Plaintiffs filed the instant action on July 17, 2014, roughly one month before this Court

issued it Ruling granting in part, and denying in part, the award of the FINRA arbitrators.  In their

amended complaint, Plaintiffs describe their view of past events and the basis for the present action:

> In 1987 Bill Rothfarb commenced an action in New York Supreme
> Court to recover sales commissions he claimed were owed to him by
> several entities and persons including Plaintiff Marshall Caro.  The
> matter was fully litigated and decided in 1991 by Order of Judge
> Moskowitz.  The practice in New York civil litigation for bench trials
> for damages is for the judge to rule on the merits and then have
> opposing counsel "settle" money judgments — either by stipulation
> or by submitting separate proposals to the judge.

> Bill Rothfarb was devastated by Judge Moskowitz's ruling . . .
> Instead of respecting the judge's decision, Bill Rothfarb decided to
> cheat.  Bill Rothfarb, through his attorney, submitted his proposed
> money judgment (which directly contravened the judge's decision) to
> the court, falsely claiming it had been agreed upon by the parties.
> Indeed, Bill Rothfarb never sent his proposal to the defendants.

> Bill Rothfarb's actions — and those of other defendants — to extort
> payment for the fraudulent obtained judgment from 2010 onwards are
> the basis for this lawsuit.

Doc. [6-1] at 2.

As expanded upon in the remainder of the complaint, the events in 2010 to which Caro refers

begin with the Rothfarb Defendants' service of the first restraining notice in July of that year.  *Id.* at

¶ 4.  The complaint alleges that "Fidelity did not follow New York procedure and improperly

restrained [the Indii account] and dishonored Indii's demands for the assets in its account."  *Id.* at ¶

5.  The remainder of the allegations run in this fashion:

> In apparent recognition of their liabilities for failing to follow New
> York Procedure and their dishonor of Indii's demands for its funds
> defendants Fidelity, Michael Shannon, Katherine Ho, and Michael
> Hoenig conspired and created the appearance of a controversy
> between Bill and Evan Rothfarb and . . . Caro over the ownership of
> Indii's funds as justification for their filing a federal interpleader
> complaint. . . .  Katherine Ho instructed her staff to advise defendant

Rothfarb that if he did not obtain a court order within five days Fidelity would release the restraint on Indii's funds. . . .

Fidelity and Katherine Ho succeeded in goading Defendant Evan Rothfarb to seek a Temporary Restraining Order in New York Supreme Court [restraining the Indii account even though] [a]ssets of 3rd parties (like Indii) are not subject to New York CPLR 5222 restraints without judicial approval — which was not sought . . .

On August 24th and 25th [prior to the August 26, 2010 Order to Show Cause hearing in New York State Supreme Court (Gische, J.)] Fidelity, Katherine Ho . . . Michael Shannon . . . and Bill and Evan Rothfarb . . . entered into a conspiracy to obstruct justice by perpetrating frauds on both the New York and Federal Courts in order to retain all of Indii's funds . . . and to extort monies from Caro . . . and to attempt to extort an additional $200,000 beyond the [New York] judgment and accrued interest . . . . Shannon explicitly offered to accept a second, improper, restraining notice without leave of court . . . . [notwithstanding the fact that] Shannon, Fidelity, Katherine Ho, and Evan Rothfarb knew this second Restraining Notice fraudulently claimed the Indii account to be the property of Caro and was served without leave of Court as required by New York Procedure . . .

[During the interpleader proceedings in the United States District Court for the Southern District of New York (Jones, J.) that followed,] Shannon falsely claimed that . . . Bill Rothfarb claimed to be entitled to [all of] the funds in the Indii account [even though] Bill Rothfarb had not claimed ownership of Indii's funds and sought only monies in the amount of the [New York] judgment. . . .

[After the United States District for the Southern District of New York (Jones, J.)] denied Caro and Indii's Motion to Dismiss Fidelity's interpleader suit . . . Caro (the principal shareholder) succumbed to the frauds perpetrated by defendants and submitted to their extortion, paying the judgment amount plus accrued interest [in or around late November 2010] . . . .

The Rothfarb defendants attempted to extort an additional $200,000 from . . . Indii, threatening to without their mandatory filing of the Satisfaction-Piece for the New York Judgment [thereby] tieing [sic] up Indii's funds in the interpleader lawsuit for years. . . .  Acting in concert, Michael Shannon wrote to the Court on May 6th, 2011, seeking an order to withhold ALL of Indii's funds pending the Court's

decision on Attorneys' fees . . . .

   In April of 2012 the Rothfarb defendants demanded an addition[al] $48,000 from Caro — else they would not provide the mandated Notice of Satisfaction of the Connecticut Judgment nor lift the lien Rothfarbs had placed on [Caro's] property located . . . in Greenwich, CT.

   On information an belief, the Rothfarbs have kept the judgments marked unsatisfied in New York and Connecticut in their continuing efforts to extort more money from plaintiffs.

*Id.* at ¶¶ 6-19 (some internal quotation marks omitted).

Based on those allegations, the amended complaint charges Defendants with violations of "the common and statutory laws of the States of Massachusetts, New York, and Connecticut," asserting specifically claims for: "trespass to chattel" (count I), "conspiracy to trespass to chattel" (count II), "abuse of process and fraud" (count III), "conspiracy to abuse process and commit fraud" (count IV), "breach of duty" (count V), "conspiracy to breach duty" (count VI), "intentional interference with contractual relations" (count VII), "conspiracy to interfere with contractual relations" (count VIII), "extortion" (count IX), "conspiracy to commit extortion" (count X), "attempted extortion" (count XI), "conspiracy to attempt extortion" (count XII), "attempted extortion" (count XIII), and "conspiracy to attempt extortion" (count XIV). *Id.* at 8-12.

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a).[3]

---

[3] Diversity of citizenship jurisdiction exists in this action because the complaint alleges that Marshall Caro is a citizen of Connecticut, that Indii is comprised of members who are citizens of Connecticut and Florida, that Fidelity is a corporate citizen of Massachusetts, that Katherine Ho is a citizen of Massachusetts, and that Bill Rothfarb, Evan Rothfarb, Michael Shannon and Michael Hoenig are citizens of New York. Doc. [6-1] at ¶¶ 1-8. In a Ruling of this Court in the FINRA award confirmation lawsuit, the Court took "judicial notice that Caro and Indii [had] represented by sworn declarations in [the interpleader action in the United States District Court for the Southern District of New York (Jones, J.)] that Indii is a citizen of *New York* for diversity purposes." *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv1066 (CSH), 2013 WL 3929708, at *6 (D. Conn. July 26,

As indicated above, Defendants move to dismiss the complaint pursuant to Rule 12(b)(6)on the ground that it fails to state a claim upon which relief can be granted.  In that regard, Defendants claim that the present action is barred under the doctrines of res judicata and collateral estoppel, and that, separate and apart from the preclusive effects of prior litigations, the complaint does not satisfy the minimum pleading requirements of Rule 12(b)(6).  Furthermore, the Rothfarb Defendants contend that counts I through XII of the complaint should be dismissed, *a fortiori*, on the ground that those claims are time-barred by the applicable statute of limitations.  The Fidelity Defendants have also moved to dismiss the complaint pursuant to Rule 12(b)(2), asserting that personal jurisdiction does not lie over Ho, Hoenig and Shannon.

## II.  DISCUSSION

### A.    Indii is Not Represented by Counsel

Before we turn to the arguments raised by Defendants in their motions to dismiss, a threshold question arises as to whether Indii may proceed in this action absent an appearance filed on its behalf by a licensed attorney.  The Defendants argue that Caro may not assert claims on Indii's behalf and that Indii's claims should be dismissed because a limited liability company may not proceed without counsel.  The law in the Second Circuit is clear that "a layperson may not represent a separate legal entity such as a corporation."  *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007).  The rule

---

2013) (emphasis added); *see Fidelity Brokerage Services LLC v. Caro, et al.*, No. 10cv5893 (BSJ) (S.D.N.Y.), Doc. # 18–1 (Declaration of Marshall Caro in Opposition to Motion for Interpleader, filed 10/4/2010), p. 2 (¶ 5) ("Upon information and belief, several of [Indii's] strategic members may be citizens of the State of New York.").  Upon receipt of the parties' declaration of citizenship, this Court concluded in a subsequent Order that "the Court has . . . 'diversity of citizenship' subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)." *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv1066 (CSH) (D. Conn. October 7, 2013), Doc. # 48. Absent new evidence on the present record suggesting that Indii's citizenship has changed, we do not have occasion to revisit our conclusion that Indii is a citizen of Connecticut and Florida and not also a citizen of New York.

applies with equal force to "solely-owned limited liability companies." *Id.* at 140; *see Chien v. Barron Capital Advisors, LLC*, No. 3:09cv1873 (CSH), 2011 WL 3047810, at *2 (D. Conn. July 25, 2011) (concluding that *pro se* litigant may not represent limited liability company). Because Indii is a limited liability company and not represented by counsel, to proceed in this action it must be represented by attorney. At this juncture, we will nevertheless exercise our discretion and consider whether the claims asserted by Caro on Indii's behalf are meritorious. If we conclude ultimately that Indii's claims survive Defendants' motion to dismiss, we will direct Indii to obtain counsel for purposes of representing it in the remainder of the proceeding.

## B.   Rule 12(b)(6) — Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*.[4] *See, e.g., Nielsen v. Rabin*, 746 F.3d 58, 62  (2d Cir. 2014)*; Krys v. Pigott*, 749 F.3d 117, 128-29 (2d Cir. 2014); *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 118, 122 (2d Cir.2013); *O'Callaghan v. New York Stock Exch.*, 563 F. App'x 11, 12 (2d Cir.) *cert. denied*, 135 S. Ct. 216, 190 L. Ed. 2d 133 (2014).

---

[4] "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Thus, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (quoting *Twombly*, 550 U.S. at 557 (internal quotation marks and brackets omitted).

"[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits.'"[5] *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citation omitted).  In ruling on a Rule 12(b)(6) motion, the court's duty is "to assess the legal feasibility of the complaint, [but] not to assay the weight of the evidence which might be offered in support thereof."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (citation and internal quotation marks omitted).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Scheuer v. Rhodes*, 416 U.S. 232, 236  (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  In fact, "it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer*, 416 U.S. at 236. *Accord Nielsen,* 746 F.3d at 62-63 ("The plausibility standard is not akin to a probability requirement...." so that "a  well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.") (quoting *Twombly*, 550 U.S. 544) (internal quotations omitted).

"In addressing the sufficiency of a complaint [the court must] accept as true all factual allegations and draw from them all reasonable inferences; but [the court is] not required to credit conclusory allegations or legal conclusions couched as factual . . .  allegations." *Nielsen*, 746 F.3d at 62 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir.2013)).  Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[5] Rule 8,  Fed. R. Civ. P., specifies that  a complaint  must "contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2).  The pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

suffice." *Nielsen*, 2014 WL 552805, at *2 (quoting *Iqbal*, 556 U.S. at 678).

With respect to *pro se* litigants, "[w]hile pro se complaints must contain sufficient factual allegations to meet the plausibility standard," the Second Circuit "look[s] for such allegations by affording the litigant 'special solicitude, interpreting the complaint to raise the strongest claims that it suggests.'" *O'Callaghan*, 2014 WL 1422395, at *1  (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) and citing and quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011)).  Because "most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements, [courts] must construe *pro se* complaints liberally, applying a more flexible standard to evaluate their sufficiency than [it] would when reviewing a complaint submitted by counsel." *Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (citation and internal quotations omitted).

"[P]ro se litigants . . . cannot be expected to know all of the legal theories on which they might ultimately recover," and, therefore, "[i]t is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim." *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir.2005).  Nonetheless, the Court need not engage in "rank speculations" to manufacture a federal claim for *pro se* plaintiffs, *Ford v. New Britain Trans. Co.*, No. 3:03cv150 (MRK), 2005 WL 1785269, at *1 (D.Conn. July 26, 2005), *aff'd*, 239 F. App'x 670 (2d Cir. 2007); and thus, a court may dismiss a complaint if it appears beyond doubt that no set of facts could be proven that would establish an entitlement to relief. *Weixel v. Bd. of Educ. of New York*, 287 F.3d 138, 145-46 (2d Cir. 2002).

## C.   Rule 12(b)(2) — Lack of Personal Jurisdiction

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v.*

17

*Robertson Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.* 21 F.3d 502, 507 (2d Cir. 1994). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Id.* (citing *Ball v. Matallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), *cert denied*, 498 U.S. 854 (1990)). "In contrast, when an evidentiary hearing is held, the plaintiff must demonstrate the court's personal jurisdiction over the defendant by a preponderance of the evidence." *Id.* (citing *Robinson*, 21 F.3d at 507 n.3). Where, as here, we determine personal jurisdiction based only on the pleadings and other supporting material "rather than conducting a 'full-blown evidentiary hearing' the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001). The Court must construe all pleadings, affidavits, and allegations "in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker v. American Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2011); *see MacDermid, Inc. v. Deter*, 702 F.3d 725, 727 (2d Cir. 2012) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.") (citation omitted)).

"[I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amendable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comport with the requirements of due process." *Metro. Life Ins. Co. v. Robertson Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *see also Whittaker v. Amer. Telecasting, Inc.* 261 F.3d 196, 208 (2d Cir. 2001); *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002). Only if the court concludes that

18

a defendant is amendable to service of process under the forum state's laws (i.e., the state's long-arm statute) does it go on to consider whether asserting jurisdiction violates constitutional principles of due process.  *Milne v. Catuogno Court Reporting Servs., Inc.*, 239 F. Supp. 2d 195, 198 (D. Conn. 2002).

In regard to the first inquiry, we must first determine whether Connecticut's long-arm statute, Conn. Gen. Stat. § 52-59b(a), confers any basis for exercising jurisdiction over Ho, Hoenig and Shannon.  The long arm statute states, in relevant part:

> (a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent:
>
> (1) Transacts any business within the state;
>
> (2) commits a tortious act within the state . . .
>
> (3) commits a tortious act outside the state causing injury to person or property within the state . . . if such person or agent
>
> > (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> >
> > (B) expects or should reasonably expect the act to have consequences in the states and derives substantial revenue from interstate or international commerce. . . .
>
> (5) uses a computer . . . or a computer network . . . located within the state

Plaintiffs claim that jurisdiction over Ho, Hoenig and Shannon lies under each of the above-cited subdivisions of § 52-59b(a).

### 1.    "Through an Agent" (Conn. Gen. Stat. § 52-59b(a))

Underpinning Plaintiffs' assertion of jurisdiction under subdivisions (1), (2) and (3) of § 52-

59b(a), are the allegations in their complaint that Ho, Hoenig and Shannon transacted business or committed tortious acts by acting in concert or conspiring with Fidelity, Bill Rothfarb and Evan Rothfarb. Plaintiffs contend in their opposition to Defendants' motion to dismiss that their pleading in that regard satisfies the language of the long-arm statute, which confers personal jurisdiction over "any non resident individual" who "transacts . . . business" or "commits a tortious act" "in person or *through an agent*." Conn. Gen. Stat. § 52-59b(a) (emphasis added); Doc. [51] at 2. We disagree.

In evaluating the viability of a plaintiff's assertion of jurisdiction, the Court accepts as true only the complaint's well-pleaded factual allegations. A conclusory assertion that an agency relationship exists between co-defendants will not be accepted as true; rather, that assertion will be afforded the assumption of truth only if it is accompanied by well-pleaded allegations in support of each common law element of agency. *See, e.g.*, *Wesley v. Schaller*, 277 Conn. 526, 543 (2006) (stating that to establish an agency relationship, a plaintiff must show: "(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking."). Plaintiff's complaint does not include well-pleaded allegations in support of their assertion that an agency relationship exists between Ho, Hoenig and Shannon (the purported principals), and Fidelity, Bill Rothfarb and Evan Rothfarb (the purported agents). In fact, the complaint contains no assertion of agency whatsoever, not even a conclusory one.[6]

---

[6] We note, in any event, that even better pleaded allegations that agency relationships exist between Ho, Hoenig, Shannon and the Rothfarb Defendants on the one hand, and Ho, Hoenig, Shannon and Fidelity on the other, would not satisfy the plausibility standard. *See Iqbal*, 556 U.S. at 678 (2009); *Twombly*, 550 U.S. at 570. The conclusion that the Rothfarb Defendants were the agents of Ho, Hoenig and Shannon is precluded by the fact that Fidelity and Bill Rothfarb were adversaries in both the Order to Show to Cause hearing in New York State Supreme Court (Gische, J.), and in the interpleader action in the United States District Court for the Southern District of New

Nor have Plaintiffs pleaded agency by alleging, in conclusory fashion, the existence of a conspiracy. Civil conspiracy is a separate legal concept comprised of elements different from the elements of agency. *See, e.g., Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 635-36 (2006) ("The elements of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff.") (citation, brackets and internal quotation marks omitted)). The plain language of § 52-59b indicates that the Connecticut legislature did not intend to subject to the state's long-arm jurisdiction co-conspirators whose individual conduct does not satisfy the requirements of the statute. Accordingly, in assessing whether personal jurisdiction lay over Ho, Hoenig and Shannon under the long-arm statute, the Court considers only whether personal jurisdiction is predicated on the actions of those defendants, not the actions of their purported agents.

### 2.        **"Commits a Tortious Act within the State" (§ 52-59b(a)(2))**

We first consider whether jurisdiction lay over Ho, Hoenig and Shannon under § 52-59b(a)(2), which confers jurisdiction on a defendant who "commits a tortious act within the state." Conn. Gen. Stat. § 52-59b(a)(2). Plaintiffs claim that the Court has personal jurisdiction over Ho, Hoenig and Shannon pursuant to § 52-59b proceeds from the premise that the restraint and liquidation of the Indii account were acts that occurred *in Connecticut*. As Plaintiffs put it, Fidelity

---

York (Jones, J.). Likewise, Plaintiffs' contention that Fidelity is the agent of Ho, Hoenig and Shannon, does not comport with the fact that Ho is an employee of Fidelity and Hoenig and Shannon are its attorneys. Like all agency relationships that are defined in law by the principal's control of the agent, the relationships between Fidelity and Ho, and Fidelity and Hoenig and Shannon, are relationships defined by Fidelity's control of the conduct of those in its employ.

"'*threw the switch*' in Connecticut to freeze, keep frozen, and to liquidate Indii's account"; an act which later afforded the Rothfarb Defendants opportunity to "extort[] Caro in Connecticut."  Doc. [51] at 3 (emphasis added).  Plaintiffs offer little in the way of explaining how that hypothetical "switch" was "thrown" in Connecticut and not, say, in Massachusetts or Rhode Island, where Ho and other Fidelity employees processed the Rothfarb restraining notices and resolved to restrain the Indii account, or New York, where the Rothfarb Defendants obtained the restraining notices from a New York state court and where a federal district court, through the advocacy of Shannon and Hoenig on behalf of Fidelity, granted Fidelity's request for interpleader relief.  Nor do they cite any authority for the proposition that the restraint of a Connecticut bank account through out-of-state, allegedly tortious conduct, equates, *ipso facto*, to committing a tort within Connecticut under § 52-59b(a)2).

Connecticut state trial courts have interpreted § 52-59b(a)(2) to mean that a defendant's physical presence in Connecticut is a prerequisite to jurisdiction under that section of the long arm statute.  *See*, *e.g.*, *Smith v. Snyder*, No. CV 990362743S, 2000 WL 739610 (Conn. Super. Ct. May 23, 2000); *Whitney v. Taplin*, No. CV 97339190S, 1997 WL 716522, at *2 (Conn. Super. Ct. Nov. 6, 1997*); *Abrams v. Riding High Dude Ranch*, No. CV 970345046, 1997 WL 791491, at *5 (Conn. Super. Ct. Nov. 21, 1997)*; *N.E. Contract Packers v. Beverage Servs.*, No. 100039, 1992 WL 157435, at *4 (Conn. Super. Ct. June 17, 1992) ("Regardless of where the harm is suffered, the tort must be committed in Connecticut, and the defendant must be physically present within the state at the time of commission.").[7]  In assessing whether jurisdiction lay over a defendant, it is fundamental

---

[7] Other Connecticut state trial courts have taken a less restrictive view and held that transmitting fraudulent misrepresentations into Connecticut by mail and telephone from outside the state was conduct "within the state" for purposes of  § 52-59b(a)(2).  *See Oppenheim v. Erwin*, No. CV000441611, 2001 WL 419236, at *2 n.7 (Conn. Super. Ct. Apr. 10, 2001) (collecting cases). That line of authority, which applies generally to communication torts, is inapposite here, as the complaint

that a plaintiff's cause of action must, as stated in the statute, "aris[e] from" one of the listed activities in subdivisions (1)-(4). Conn. Gen. Stat. § 52-59b(a); *see Ryan v. Cerullo*, 282 Conn. 109, 122-23, 918 A.2d 867, 870 (2007) (concluding that client's claims did not "arise from" defendants' business activity in Connecticut)). For purposes of § 52-59b(a)(2) analysis, a plaintiff's injury must arise from a tortious act committed by a defendant within the state. Plaintiffs must therefore show that Ho, Hoenig and Shannon committed allegedly tortious acts in connection with restraint of the Indii account while within Connecticut. They do not come close to making that showing.

First, the complaint contains no allegation, nor does the record reveal, any basis from which to conclude that Ho, Hoenig and Shannon committed a tortious act within Connecticut in the latter half of 2010, when the Indii account was restrained and the interpleader action resulting in its liquidation was filed. Second, to the extent the record suggests that Ho, Hoenig and Shannon stepped foot in Connecticut, the sworn affidavit of each individual defendant make clear that their activity had nothing to do with the restraint of the Indii account.

Shannon indicates in his affidavit that he made occasional appearances in state and federal courts in Connecticut on an "infrequent" and "pro hac basis." Doc. [29] ¶ 6. Those appearances, including his representation of Fidelity before this Court on Fidelity and Plaintiffs' cross-motions to affirm or vacate the FINRA arbitration panel award, are not related to the restraint of the Indii account.

Likewise, Hoenig indicates in his affidavit that his representation of Fidelity was confined to his representation of Fidelity in New York City barring the "one occasion" in which he

_____

does not allege that the restraint of the Indii account was caused by fraudulent misrepresentations transmitted to Connecticut by mail or telephone.

"accompanied . . . Ms. Ho to the Superior Court, State of Connecticut for Ms. Ho's brief appearance as a custodian of records in response to a subpoena duces tecum in a proceeding in Connecticut not related to the disputes with Bill Rothfarb or restrain of the Indii account."  Doc. [28] at ¶ 3.  That proceeding, a reference to the probate of the estate of Caro's late wife, was in June 2011, almost one year after the restraint of the Indii account.  It is unrelated to that allegedly tortious act.

Similarly, Ho indicates in her affidavit that apart from her appearance at that probate proceeding, "since at least 2009 [she has] not been in the State of Connecticut in connection with any Fidelity matters." Doc. [27] at ¶ 4.  Plaintiffs rely on that statement for the proposition that "Ho has worked (and was paid) for her services in Connecticut in 2009 and earlier." Doc. [42] at 7.  Ho's affirmation, contrary to Plaintiffs' assertion, says nothing about where Ho worked *prior to* 2009, and in any event, where Ho worked *in* 2009 is not material to her allegedly tortious conduct in 2010. There is no evidence in the record to conclude that she was in Connecticut in connection with the restraint of the Indii account.[8]  Plaintiffs have therefore failed to allege facts necessary to show that Ho, Hoenig and Shannon committed a tort within Connecticut as required by § 52-59b(a)(2).

### 3.   "Transacts Any Business" (Section 52-59b(a)(1))

Plaintiffs also claim that jurisdiction lies over Ho, Hoenig and Shannon under § 52-59(a)(1), which confers jurisdiction on defendants who "[t]ransact any business within the state." Conn. Gen. Stat. § 52b-59(a)(1).  In support of that claim, Plaintiffs state that Ho, Hoenig and Shannon transacted business within Connecticut by "freezing and liquidating and wiring the proceeds of the

---

[8] Caro's representation that Ho "appeared" at the probate proceeding "voluntarily" does not accurately represent the record.  Doc. [42] at 7.  Although Caro cites Ho's affidavit in support of that particular assertion, Ho states in her affidavit that she "appeared in a Connecticut State Court in response to a *subpoena* to produce Fidelity account records." Doc. [27] at § 4 (emphasis added).

Indii account."  Doc. [51] at 2.  Presumably, Plaintiffs mean that Ho transacted business within Connecticut by participating in the processing of the restraint of the Indii account from her office in Massachusetts or Rhode Island and that Hoenig and Shannon assisted in that effort, and in turn also transacted business within Connecticut, by representing Fidelity in legal proceedings in New York that preserved the restraint on the Indii account and caused its eventual liquidation.

A plaintiff asserting jurisdiction under § 52b-59(a)(1)) must show "some definitive act taken by the defendant that evinces a purposeful availment of the privileges of conducting the subject activity within the forum state and that, subsequently, invokes the benefits and protections of its laws." *Walshon v. Ballon Stoll Bader & Nadler, P.C.,* 121 Conn. App. 366, 372, 996 A.2d 1195, 1199 (2010) (citing *Ryan v. Cerullo*, 282 Conn. at 120); *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (interpreting New York State's analog to Conn. Gen. Stat. § 52b-59(a)(1), CPLR 302 (a)(1)), to mean that plaintiff must show that "the defendant's activities . . . were purposeful and there is a substantial relationship between the transaction and the claim asserted"). "Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d at 380 (internal quotation marks and citation omitted); *see Zartolas v. Nisenfeld*, 184 Conn. 471, 474, 440 A.2d 179 (1981) (looking to identical New York statute for guidance in interpreting § 52-59b).  Not all purposeful activity, however, constitutes a "transaction of business" within the meaning of § 52b-59(a)(1).  *Id.*  "For example, the negotiation of contracts, standing alone, does not constitute 'transacting business' in Connecticut. . . .  Similarly, the transmission of communications between an out-of-state defendant and a plaintiff within the jurisdiction does not, by itself, constitute the transaction of business in a forum state." *LucidRisk, LLC v. Ogden*, 615 F.

Supp. 2d 1, 5 (D. Conn. 2009) (citation omitted)); *see also Ryan v. Cerullo*, 282 Conn. 109, 918

A.2d 867, 870 (2007) (New York accountant and associated accounting firm that prepared tax return

for Connecticut resident was not subject to Connecticut jurisdiction under § 52-59b(a)(1)); *Solana*

*v. Calegari*, 108 Conn. App. 731, 738-39, 949 A.2d 1257 (2008) (no jurisdiction under § 52-

59b(a)(1) when conversation about loan took place in Connecticut but actual loan funds were not

withdrawn from financial institution in Connecticut); *Rosenblit v. Danaher*, 206 Conn. 125, 138,

140-41, 537 A.2d 145 (1988) (Massachusetts attorney named as defendant in action alleging that he

negligently represented plaintiffs in connection with Massachusetts development project was not

subject to jurisdiction in this state under § 52-59b(a)(1) even though Massachusetts attorney had

business meeting plaintiff in Connecticut).  Courts must examine the "nature and quality rather than

the amount of Connecticut contacts to determine whether there was purposeful activity." *Vertue Inc.*

*v. Meshkin*,, 490 (D. Conn. 2006) (internal quotation marks and citation omitted).  "The inquiry

focuses on whether the defendant 'engaged in some purposeful activity here . . . in connection with

the matter in suit.'" *Id.* (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y. 2d 13, 16, 308

N.Y.S.2d 337, 340, 256 N.E. 2d 506, 507 (1970 (quotations omitted)).

In *Zartolas*, for example, the Connecticut Supreme Court concluded that a "single purposeful

business transaction" qualified as "transacting business" under § 52b-59(a)(1). *Zartolas v. Nisenfeld*,

184 Conn. at 474.  In that case, the defendants had by warranty deed conveyed real estate located in

Connecticut to plaintiffs.  The deed was executed in Iowa and there were no allegations that the

closing or sale of the property occurred in Connecticut, or that defendants, or anyone acting on their

behalf, solicited plaintiffs' purchase or entered the state to deal with plaintiffs.  *Id.* at 471-73.  In

granting defendants' motion to dismiss for lack of personal jurisdiction, the trial court held "that the

sale of real estate does not satisfy the 'transacts any business' requirement.'"  *Id.* at 473.  The Connecticut Supreme Court set aside the judgment and remanded for further proceedings, concluding that by "owning land in Connecticut the defendants invoked the benefits and protection of Connecticut's laws of real property," *id.* at 475, and had "purposefully availed themselves of the privileges of owning and selling Connecticut land."  *Id.* at 478.

In construing the term "transacts any business" to include even a "single purposeful business transaction," the Connecticut Supreme Court in *Zartolas* broadly interpreted § 52b-59(a)(1).  *See Austen v. Catterton Partners V, LP*, 729 F. Supp. 2d 548, 560 (D. Conn. 2010) (observing that *Zartolas* interpreted § 52-59b(a)(1) "quite broadly").  But even under that broad interpretation of the term, we cannot conclude that Ho, Hoenig and Shannon engaged in purposeful acts in Connecticut. Ho, from an office located outside Connecticut, participated in the decision to restrain the Indii account in accordance with the restraining notices served on Fidelity.  Hoenig and Shannon represented Fidelity in legal proceedings in New York in connection with the Indii account.  Unlike the defendants in *Zartolas*, neither Ho, Hoenig nor Shannon purposefully availed themselves of the privileges of conducting activities within Connecticut or invoked the benefits and protections of Connecticut's laws.  That conclusion is in keeping with the affidavits of Ho, Hoenig and Shannon, each of whom state that they "do not transact business within the state of Connecticut."  Doc. [27] at § 6; Doc. [28] at § 4; Doc. [29] at § 6 (internal quotation marks omitted).  Plaintiffs offer no evidence to rebut  those sworn statements.  Accordingly, Plaintiffs have failed to show that Ho, Hoenig and Shannon are subject to the state's long arm jurisdiction under § 52b-59(a)(1).

      **4.**        **"Tortious Act Outside the State Causing Injury to Person or Property within the State" (Section 52-59b(a)(1))**

Plaintiffs also contend that jurisdiction over Ho, Hoenig and Shannon lies under § 52-59(a)(3). That subsection of the long-arm statue confers jurisdiction on a defendant who, in addition to satisfying the requirements of sub (A) and sub (B) of that section, "commits a tortious act outside the state causing injury to person or property within the state." Conn. Gen. Stat. § 52-59(a)(3). Ho, Hoenig and Shannon accept the premise that the alleged "tortious act[s]" in this case occurred outside of Connecticut, but they refute the proposition that the "injury" occurred in Connecticut as well. *Id.*; *see* Doc. [45] at 4.

In *Ryan v. Cerullo*, the Connecticut Supreme Court indicated that it in order to determine the "situs of plaintiff's injury" it would look to "where all of the critical events occurred." 282 Conn. at 124 n.15. The court noted that in construing § 52-59(a)(3) other courts have relied on case law interpreting New York's corresponding long-arm statute, in which"'it has repeatedly been held that the [fact] that a plaintiff who has lost profits or suffered other pecuniary injury is domiciled or incorporated in that state or that New York is the plaintiff's principal of business [does] not necessarily make New York the situs of the plaintiff's injury. . . . Rather, in the context of commercial torts, the place of injury is generally the place where the critical events associated with the dispute took place." *Id.* (citing *Bross Utilities. Service. Corp.*, *v. Aboubshait*, 489 F. Supp. 1366, 1374 (D. Conn. 1980) (internal quotation marks and citations omitted)); *see also Bankers' Bank Ne. v. Ayer*, No. 3:11cv262 (JBA), 2012 WL 1067677, at *7 (D. Conn. Mar. 30, 2012) (adopting"critical events" test); *Vertrue Inc. v. Meshkin*, 429 F. Supp. 2d at 493-94 (D. Conn. 2006) (same)*.* Here, the critical events associated with Plaintiffs' alleged injury — the service and receipt of the restraining notices and subsequent interpleader action — took place in New York, not Connecticut.

But even assuming, *arguendo*, that the actions of Ho, Hoenig and Shannon resulted in an in-

28

state injury to Plaintiffs, Plaintiffs must make the additional showing prescribed in subdivisions (A) and (B) of § 52-59(a)(3): that Ho, Hoenig and Shannon engaged in ongoing activity within Connecticut, or alternatively, that Ho, Hoenig and Shannon reasonably believed that their allegedly tortious acts could have consequences in Connecticut and that they earned substantial revenue from interstate or international commerce. Conn. Gen. Stat. § 52-59(a)(3)(A) and (B). Because there is no evidence in the record that Ho, Hoenig and Shannon derive substantial revenue from interstate or international commerce, Plaintiffs' have not satisfied subdivision (B). Plaintiffs contend, however, that with respect to subdivision (A), Ho, Hoenig and Shannon have engaged in ongoing activity within Connecticut. In that regard, Plaintiffs claim that "Shannon has appeared for pay in state and federal courts in Connecticut"; that "Ho has worked (and was paid) for her services in Connecticut in 2009 and earlier"; and that Hoenig was "[p]resumably" paid for his appearance at the probate hearing referenced above. Doc. [42] at 6-7 (citations, brackets, and quotation marks omitted).

The intent of the condition imposed in subdivision (A) is to ensure that jurisdiction is exercised only over tortfeasors "who have sufficient contracts with this state so that it is not unfair to require them to answer in this state for injuries they cause here by acts done elsewhere." N.Y. Jud. Conf., Twelfth Ann. Rep. 339, 343 (1967) [hereinafter cited as Jud. Conf. Rep.]; *see* N.Y. C.P.L.R. C302:12 (McKinney). That recitation of legislative intent is derived from the statutory history of N.Y. C.P.L.R. § 302(a)(3), but it applies with equal force to the instant analysis "because the New York provision formed the basis for, and is identical in relevant part to, § 52-59b(a)(3)." *Robb v. Robb*, 620 F. Supp. 2d 282, 286 (D. Conn. 2009); *see Zartolas v. Nisenfeld*, 184 Conn. at 474 ("We note . . . that enacting § 52-59b, the legislature used New York Civil Practice Law § 302 as a model.

We therefore find pertinent the judicial interpretation given to that New York statute.") (citation omitted)).  New York's legislative history also makes clear that the doing business requirement of its long-arm statute requires more than the "one shot"business transaction described in its equivalent to § 52-59b(a)(1).  Jud. Conf. Rep.; *see* N.Y. C.P.L.R. C302:12 (McKinney).  Therefore, because the Court has concluded that not even the limited actions of Ho, Hoenig and Shannon qualify as "business transactions within Connecticut" under § 52-59b(a)(1), the Court also concludes, without difficulty, that their actions do not satisfy the ongoing activity requirement of § 52-59b(a)(3)(A).

That conclusion is, again, in keeping with the affidavits of Ho, Hoenig and Shannon, each of whom attest that they "do not regularly do or solicit business, engage in any other persistent course of conduct or derive substantial revenue from goods consumed or services rendered in Connecticut" and do not "derive substantial revenue from interstate or international commerce." Doc. [27] at ¶ 6; Doc. [28] at ¶¶ 4-5; Doc. [29] at ¶ 6.  The absence of evidence in the record contradicting those sworn statements precludes the conclusion that jurisdiction over Ho, Hoenig and Shannon lies under § 52-59(a)(3).

### 5.    **"Uses a Computer or Computer Network" (Section 52-59b(a)(5))**

Finally, Plaintiffs contend that jurisdiction over Ho lies under § 52-59b(a)(5), which confers jurisdiction on a nonresident individual who "uses a computer . . . or a computer network . . . located within the state."  Conn. Gen. Stat. § 52-59b(a)(5).[9]  In support of that assertion, Plaintiffs' rely on

_____

[9]Section 52-59b(a)(5) incorporates the following definitions:

(1) "Computer" means an electronic, magnetic or optical device or group of devices that, pursuant to a computer program, human instruction or permanent instructions contained in the device or group of devices, can automatically perform computer operations with or on computer data and can communicate the results to another computer or to a person.  "Computer" includes any connected or directly related

the signed declaration of Caro, in which he states: "I know of my own personal knowledge that Fidelity maintains a private computer network in Connecticut . . . and that . . . Ho . . . is a user of this network." Doc. [42-1] at ¶ 3.  Caro's statement that Ho uses a computer network in Connecticut is his *ipse dixit*.  Apart from Plaintiffs' allegation that Ho sent emails to certain Fidelity employees, directing those employees to restrain the assets of the Indii account, Plaintiffs offer no other proof or well-pleaded allegations in support of the assertion that Ho used a computer network located in Connecticut in connection with the restraint of the Indii account.

The Second Circuit's decision in *MacDermid, Inc. v. Deiter*, 702 F.3d 725 (2d Cir. 2012), underscores a pleading deficiency at bar and provides practical guidance to litigants invoking long-arm jurisdiction under § 52-59b(a)(5).  In that case, MacDermid, Inc., a company with its principal place of business in Waterbury, Connecticut, sued Deiter, its former employee, alleging unauthorized access and misappropriation of trade secrets in violation of Conn. Gen. Stat. §§ 53a-251 and 25-51 *et seq*.  *Id.* at 727.  Deiter was domiciled in Canada and was employed by MacDermid's subsidiary in Canada.  *Id.* at 726-27.  When Deiter became aware of her impending termination, she forwarded from her MacDermid email account to her personal email account allegedly confidential and proprietary MacDermid data files.  The United States District Court for the District of Connecticut dismissed the complaint for lack of personal jurisdiction.  It "reasoned that Deiter had not used a

---

device, equipment or facility that enables the computer to store, retrieve or communicate computer programs, computer data or the results of computer operations to or from a person, another computer or another device. . . .

(3) "Computer network" means a set of related, remotely connected devices and any communications facilities including more than one computer with the capability to transmit data among them through the communications facilities.

Conn. Gen. Stat. § 53–451(a).

Connecticut computer or computer network but had simply sent email 'from one computer in Canada to another computer in Canada'; that is, from her MacDemid computer at her home to her personal computer at her home." *Id.* at 728 (quoting district court).  The Second Circuit reversed and remanded for further proceedings, concluding that long-arm jurisdiction was authorized over Deiter by § 52-59b(a)(5) because "[t]he record before the district court indicated that, '[i]n order to use [her] MacDermid e-mail account and to obtain said confidential data files, Ms. Deiter accessed computer servers located in MacDermid's offices in Waterbury, Connecticut.'" *Id.* (quoting district court).[10]
*Id.*

Like Deiter in *MacDermid*, Ho is also alleged to have sent emails from a computer located outside Connecticut.  Unlike in *MacDermid*, however, the record does not indicate that Ho accessed a server located in Connecticut in order to send emails from an out-of-state computer, and the complaint includes no well-pleaded allegations in support of that assertion.

Although the Court in deciding a motion to dismiss for lack of jurisdiction must construe the pleadings and supporting material in the light most favorable to plaintiff, the court of appeals in *MacDermid* made explicit the obvious qualification implicit in that rule by stating, "[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by defendant's affidavits." *Id.* at 727 (quoting *Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993)).  Here,

---

[10] The Court of Appeals went on to conclude that jurisdiction over Deiter accorded with due process because unlike most "Internet users" who "perhaps, have no idea of the location of the servers through which they send emails . . . MacDermid . . . alleged that Deiter knew that the email servers she used and the confidential files she misappropriated were both located in Connecticut." *MacDermid, Inc. v. Deiter*, 702 F.3d at 730.  There is no allegation at bar that Ho knew that Fidelity's email server through which she sent email was located in Connecticut.

Caro's declaration that Ho used a computer network located in Connecticut is controverted by Ho's sworn affidavit, in which she states "I do not . . . use a computer or computer network located in Connecticut."  Doc. [27] at ¶ 6.  In light of Ho's affidavit directly rebutting Caro's declaration, and in the absence of sufficient facts establishing that Ho used a computer or computer network located in Connecticut, we conclude that Plaintiffs have not carried their burden on this record of showing that jurisdiction over Ho lies under § 52-59b(a)(5).

Notwithstanding that conclusion, we hesitate at this juncture to grant Ho's Rule 12(b)(2) motion to dismiss absent discovery revealing whether Ho, in connection with the restraint of the Indii account, sent emails through a server located in Connecticut.  Her affidavit indicates, in the broadest terms, that she did not use a computer or a computer network located in Connecticut.  We have no reason to doubt that statement was made in good-faith, but Ho is a layman who may not know the location of Fidelity's email servers or be apprised of the most recent Second Circuit authority interpreting the breadth of our jurisdiction under § 52-59b(a)(5).  She does not swear to her knowledge of either.  A better approach is for us to authorize jurisdictional discovery for this limited purpose in the event the complaint survives Defendants' 12(b)(6) motions to dismiss.  *See Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir.2009) (whether to allow jurisdictional discovery is in district court's broad discretion).  If the complaint is dismissed, we need not concern ourselves further with the question of personal jurisdiction with respect to Ho.

Because Plaintiffs do not assert that jurisdiction over Hoeing and Shannon lies under any viable theory, including their use of a computer or computer network located in Connecticut, we will grant Hoenig's and Shannon's Rule 12(b)(2) motion to dismiss on this record for the reasons stated

above.[11]

## D.   Rule 12(b)(6) — Res Judicata and Collateral Estoppel

We turn next to Defendants' motion to dismiss the complaint on the ground that it is barred by the doctrines of res judicata and collateral estoppel.  It is well-settled that res judicata and collateral estoppel challenges may properly raised via a Rule 12(b)(6) motion to dismiss. *Michaelesco v. Estate of Richard*, 355 F. App'x 572, 573 (2d Cir. 2009); *see Day v. Moscow*, 955 F.2d 807, 811 (2d Cir. 1992) ("[W]hen all relevant facts are shown by the court's own records, of which the court takes notice, the defense [of res judicata] may be upheld on a Rule 12(b)(6) motion without requiring an answer.").

Res judicata (claim preclusion) and collateral estoppel (issue preclusion) have been described as related ideas on a continuum.  *Hayes v. Am. Fitness Beverage Wholesalers Ltd.*, No. 3:07cv0187 (EBB), 2009 WL 928654, at * 5 (D. Conn. Apr. 3, 2009); *see Dowling v. Finley Associates*, *Inc.*, 248 Conn. 364 (Conn. 1999).  A "fundamental precept" of both doctrines "is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction cannot be disputed in a subsequent suit between the same parties or their privies."  18 Moore's Federal Practice 3d. § 132.01 [4][1] (Matthew Bender ed.).  "Although the doctrines of collateral estoppel and res judicata are conceptually related, in practice their application may yield distinct results."  *Connecticut Nat.*

---

[11] Unlike the Fidelity Defendants, the Rothfarb Defendants do not also move to dismiss the complaint for want of personal jurisdiction.  We may not consider the question *sua sponte*.  *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp*., 619 F.3d 207, 213 (2d Cir. 2010) (stating "a district court should *not* raise personal jurisdiction *sua sponte* when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court") (emphasis in original); *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011) ("It is well established that party forfeits its defense of lack of personal jurisdiction by failing timely to raise the defense in its initial responsive pleading.").

*Bank v. Rytman*, 241 Conn. 24, 43, 694 A.2d 1246, 1256 (1997).  We therefore review the critical

differences between the doctrines, delineated by Professor Moore:

> claim preclusion applies to whole claims, whether litigated or not,
> whereas issue preclusion applies to particular issues that have been
> contested or resolved.  Claim preclusion is broader in scope than
> issue preclusion as to the claims that come within its purview, but
> narrower in scope as to the parties to whom the doctrine can be
> applied.  While claim preclusion and issue preclusion advance the
> same basic principle — the need for finality in judicial proceedings
> — they do so in substantially different ways.  Claim preclusion
> prevents parties and those in privity with them from raising legal
> theories, claims for relief, or defenses which could have been raised
> in the prior litigation, even though such claims were never actually
> litigated in the prior case.  Issue preclusion, on the other hand,
> precludes litigation of issues actually litigated and necessary to the
> outcome of the prior case, even if such issues are subsequently
> presented as part of a different "claim."  With only a few narrow
> exceptions, claim preclusion operates only between the parties to the
> prior litigation, while a stranger to the first action may invoke issue
> preclusion against a party to that action.

18 Moore's Federal Practice 3d. § 131.13 [2][1] (Matthew Bender ed.) (footnote omitted).

Defendants contend that the FINRA arbitration has a preclusive effect on the present action.

Both res judicata and collateral estoppel can be predicated on arbitration proceedings.  *See*

*Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *Thompson v. Cnty. of Franklin*, 15 F.3d

245, 253 (2d Cir. 1994).  Plaintiffs claim, however, that since the arbitration panel did not permit

them to bring claims against defendants other than Fidelity itself, the FINRA arbitration does not bar

the present action, which names additional defendants.  Crediting Plaintiffs' representation that the

arbitration panel did not permit Plaintiffs to name additional defendants, their argument, in any

event, is not well-founded as "collateral estoppel can be raised by a party who was not a party to the

prior proceeding from which the preclusive effect arises."  *Boguslavsky v. Kaplan*, 159 F.3d at 719

n.3 (concluding that party that did not submit to NASD arbitration may raise the defense of collateral estoppel in subsequent action).  Similarly, res judicata can be raised by a party who was not a party to the prior proceeding from which the preclusive effect arises, provided the party raising the res judicata defense is in privity with a defendant from the prior proceeding.  *Somerville House Mgmt., Ltd. v. Arts & Entm't Television Network,* No. 92cv4705 (LJF), 1993 WL 138736, at *2 (S.D.N.Y. Apr. 28, 1993) (stating "a number of courts . . . have held that newly-added defendants may assert a res judicata defense as long as the newly-added defendants have sufficiently close relationship to the original defendant") (internal quotation marks and citations omitted)).

## 1.    Res Judicata

"The doctrine of res judicata, or claim preclusion, holds that following entry of a valid final judgment, 'the parties to the suit and their privies are thereafter bound not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.'"  *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A..*, 56 F.3d 359, 365 (2d Cir. 1995) (quoting *C.I.R. v. Sunnen*, 333 U.S. 591, 597 (1948); *accord Joseph v. Athanasopoulos*, 648 F.3d 58, 59 n. 1 (2d Cir. 2011).  "[R]es judicata . . . applies in 'later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same case of action."  *In re Adelphia Recovery Trust*, 634 F.3d 678, 694 (2d Cir. 2011) (quoting *EDP Med. Computer Sys. Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2011) (quoting *In re Teltronics Servs. Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)) (alterations in original).  "Two claims are considered to be the same cause of action if they each arise from a common nucleus of operative fact."  *Lobaito v. Chase Bank,* No. 11cv6883 (PGG), 2012 WL

3104926, at *2 (S.D.N.Y. July 31, 2012) *aff'd*, 529 F. App'x 100 (2d Cir. 2013) (quoting *Maysonet v. Citi Group, Inc.*, No. 10cv4616 (SAS), 2011 WL 476610, at *3 (S.D.N.Y. Feb. 9, 2011) (citing *Jordan v. Metro. Life Ins. Co.*, No. 03 Civ. 4110, 2004 WL 1752822, at *3 (S.D.N.Y. Aug. 4, 2004)). "To determine whether two actions arise from the same nucleus of operative facts, [a court must] consider 'whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations.'" *Id.* (quoting *Waldman v. Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000) (internal quotation marks omitted)); *see Hayes v. Am. Fitness Beverage Wholesalers Ltd.*, No. 3:07cv0187 (EBB), 2009 WL 928654, at * 5 (D. Conn. Apr. 3, 2009) (to determine whether two claims arise from the same cause of action the court should compare the complaint in the second action with the pleadings and the judgment in the earlier action).

"'[T]he principle of privity bars relitigation of the same cause of action against a new defendant known by a plaintiff at the time of the first suit where the new defendant has a sufficiently close relationship to the original defendant to justify preclusion.'" *Id.* (quoting *Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*., 56 F.3d 359, 367-68 (2d Cir. 1995)). "As a general rule, privity exists when the interest of a nonparty were adequately represented in the initial action." *Waldman v. Vill. of Kiryas Joel*, 39 F. Supp. 2d 370, 380 (S.D.N.Y. 1999) *aff'd*, 207 F.3d 105 (2d Cir. 2000) (citing *Expert Elec., Inc. v. Levine*, 554 F.2d 1227, 1233 (2d Cir. 1977). Privity does not require a formal legal relationship between parties; rather, privity "is to be applied with flexibility." *Amalgamated Sugar Co. v. NL Industries, Inc*., 825 F.2d 634, 640 (2d Cir.), *cert . Denied.* 484 U.S. 992 (1987); *see Alpert's Newspaper Delivery v. New York Times*, 876 F.2d 266, 270 (2d Cir.1989) ("issue [of privity] is one of substance rather than the names in the caption of the case"). "Thus, a

37

number of courts have found that alleged co-conspirators can be considered 'in privity' with one another for res judicata purposes, despite the fact that those parties might have some adverse interests." *Somerville House Mgmt., Ltd. v. Arts & Entm't Television Network,* No. 92cv4705 (LJF), 1993 WL 138736, at *2 (S.D.N.Y. Apr. 28, 1993); *see Waldman v. Vill. of Kiryas Joel*, 39 F. Supp. 2d at 381-82.  In addition, it is generally the case that "an employer-employee or agent-principal relationship will provide the necessary privity for claim preclusion with respect to matters within the scope of the relationship, no matter which party is first sued."  18 Moore's Federal Practice 3d. § 131.40 [3][f] (Matthew Bender ed.); *Tibbetts v. Stempel*, 354 F. Supp. 2d 137, 148 (D. Conn. 2005) *aff'd sub nom. Tibbetts v. Levin*, 288 F. App'x 743 (2d Cir. 2008) (quoting same and concluding that employees of university were in privity with university for the purposes of claim preclusion); *see Cahill v. Arthur Andersen & Co.*, 659 F. Supp. 1115, 1122 (S.D.N.Y. 1986) *aff'd*, 822 F.2d 14 (2d Cir. 1987) (corporations and their officers and directors are in privity for purposes of res judicata).

In the present action, the complaint alleges that the Fidelity Defendants unlawfully restrained the Indii account, conspired with the Rothfarb Defendants to continue the restraint, filed the interpleader action causing the liquidation of the Indii account, and subsequently wrote to the interpleader court requesting that the balance of Indii's funds deposited in the court registry not be released until the court ruled on Fidelity's motion for attorneys' fees in the interpleader action.  Doc. [6-1] at ¶¶ 1-19.  Plaintiffs claims in that regard not only emerge from the same nucleus of operatives facts as the FINRA arbitration, each of those allegations were asserted in the arbitration proceeding. In Plaintiffs' statement of claim and amended statement of claim submitted to the arbitration panel, Plaintiffs alleged that Fidelity, *inter alia*: unlawfully restrained the Indii account pursuant to the July 2010 restraining notice; "creat[ed] the pretense of an ownership controversy over the Indii account

38

so as to qualify a Federal Interpleader claim against Indii"; "conspired with Rothfarb in an attempt to keep the account restraints in place" by entering into a stipulation with the Rothfarb Defendants at the Order to Show Cause hearing in New York State Supreme Court (Gische, J.) and "accept[ing] a second, illegal restraining notice . . . issued without Leave of Court"; and "obtain[ed] an ex parte Order from District Judge Jones [in the federal interpleader action] to deposit Indii's funds into the Federal registry." Doc. [29-20] at ¶¶ 12-16. Based on those allegations, Plaintiffs stated in their amended statement of claim that they sought, *inter alia*, to have the "Indii . . . account restored in full" and "reimbursement of the monies Caro paid to Rothfarb." Doc. ¶¶ 21, 31. Plaintiffs reiterated and expanded upon those claims in their pre-hearing brief, and also asserted in that submission an additional allegation that is pleaded in the present action: that in May 2011 Fidelity, through Shannon, wrote to the federal district court in the interpleader action "seeking an order to withhold ALL of Indii's funds pending the Court's decision on Attorneys' fees." Doc. [29-21] at 10. Plaintiffs again asserted in their pre-hearing brief that they sought restitution for the Indii account. *Id.* at 24. Plaintiffs therefore sought damages for Fidelity's unlawful restraint of the Indii account — the same redress sought here.

Yet Plaintiffs argue at bar that the FINRA arbitration is not res judicata because the arbitration panel did not consider and decide the claims asserted in the present action, and instead limited argument, evidence and the scope of their award to the issue of whether Fidelity breached its agreement with Plaintiffs to submit disputes to arbitration by filing the interpleader action. Plaintiffs' claim for breach of that arbitration agreement was but one of the claims considered by the FINRA arbitrators. *See* Doc. [29-22] at 1 (FINRA Award, noting claim for "breach of contract"). There is no basis in the record from which to conclude, as Plaintiffs suggest, that the arbitration

panel did not consider their claims based on Fidelity's allegedly unlawful restraint of the Indii account.  On the contrary, the arbitration panel stated explicitly that it had considered all of Plaintiffs claims.

For instance, in one section of the arbitration panel's written Award, captioned "CASE SUMMARY," the arbitrators noted that Plaintiffs had asserted causes of action based on, *inter alia*, "breach of fiduciary duty" and "illegal retention of funds." *Id.* at 2.  In another section captioned "RELIEF REQUESTED," the arbitrators stated that Plaintiffs requested, *inter alia* "the account be restored" and "reimbursement."  *Id.*   In yet another section captioned "OTHER ISSUES CONSIDERED AND DECIDED," the arbitration panel acknowledged that each member of the panel had "read the pleadings and other materials filed by the parties." *Id.*  Finally, in another section captioned "AWARD," the arbitrators again indicated that they had considered the parties' submissions, testimony and evidence, and denied Plaintiffs' claims in their entirety. *Id.*  The written Award of the arbitration panel therefore indicates that the arbitration panel considered *all* of Plaintiffs' claims against Fidelity, including those claims which stemmed directly from Fidelity's allegedly unlawful restraint of the Indii account.

Accordingly, because Plaintiffs' claims against Fidelity in this action arise from the same nucleus of operative facts as the FINRA arbitration, and because the present action does not assert claims based on facts outside of those adjudicated by the arbitration panel, we conclude that the FINRA arbitration is res judicata as to Plaintiffs' claims against Fidelity in the action at bar, notwithstanding that fact that Plaintiffs rely on legal theories different from those asserted in the FINRA arbitration.  "'Even claims based upon different legal theories are barred provided they arise from the same transaction or occurred.'" *Malcom v. Board of Educ. of Honeoye Falls-Lima Cent*,

40

506 Fed. Appx. at 69 (quoting *Berrios v. N.Y.C. Hous. Auth.*, 564 F.3d 130, 135 (2d Cir. 2009) (internal quotation marks omitted)); *see Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 875 (2d Cir. 1991) ("A party may not avoid the preclusive effect of res judicata by asserting a new theory of a different remedy.").  Plaintiffs' claims against Fidelity will therefore be dismissed.

The determination that Plaintiffs' claims against Fidelity are barred by the doctrine of res judicata has a preclusive effect on Plaintiffs' claims against defendants in privity with Fidelity whose alleged conduct was within the scope of their relationship with Fidelity.  The connection between Fidelity and Ho, Hoenig and Shannon is sufficiently close to establish privity between Fidelity and those defendants.  That conclusion is almost self-evident.  Ho is an employee of Fidelity.  Hoenig and Shannon are its attorneys.  Moreover, apart from the conclusion that there is privity between Fidelity and those in its employ, the complaint does not indicate that Ho, Hoenig and Shannon acted outside the scope of their relationship with Fidelity such that the complaint could be construed as asserting a new cause of action against those defendants in their individual capacity.  The FINRA arbitration is therefore res judicata as to Plaintiffs' claims against Ho, Hoenig and Shannon.  The claims against those defendants will be dismissed accordingly.

Barring certain exceptions discussed below, the Court also concludes that privity exists between the Fidelity Defendants and the Rothfarb Defendants to the extent the complaint alleges that the Rothfarb Defendants conspired with the Fidelity Defendants to injure Plaintiffs.  As stated above, courts have held that alleged co-conspirators are "in privity" with one another for res judicata purposes.  *See In re Teltronics Services, Inc.*, 762 F.2d at 192 (newly added defendant was "alleged to be a co-conspirator in the second Southern District action filed against the [other] defendants, and is entitled to the res judicata effect of that decision"); *Gambocz v. Yelencsics*, 468 F.2d 837, 842 (3d

Cir.1972) ("relationship of the additional parties [co-conspirators] to the second complaint was so close to parties to the first" that second action was barred); *W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, No. 13cv981 (PGG), 2015 WL 1514539, at *27 (S.D.N.Y. Mar. 31, 2015) (pleadings sufficient to support a finding of privity where Citibank's co-defendants not named in prior suit); *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 166 (W.D.N.Y. 2000) (concluding "because NYNEX is alleged to have participated in a single conspiracy with AT & T Technologies, a sufficiently close relationship exists between the alleged con-conspirators to preclude Discon from proceeding against NYNEX in a second, separate action"); *Fonseca v. Columbia Gas Sys., Inc.*, 37 F. Supp. 2d 214, 228 (W.D.N.Y. 1998) ("I find that a sufficiently close relationship existed between the alleged coconspirators to preclude plaintiff from proceeding against any of them in this subsequent, separate action"); *Somerville House Management, Ltd. v. Arts & Entertainment Television Network*, 1993 WL 138736, at * 3 (S.D.N.Y. Apr.28, 1993) (finding that where plaintiff had prior opportunity to raise all claims related to the disputed transaction and the same conspiracy was alleged in both actions, res judicata applied); *McLaughlin v. Bradlee*, 599 F.Supp. 839, 847–48 (D.D.C.1984) (defendants may "defensively assert claim preclusion against [plaintiff] even though none of the prior suits named all six of them as defendants," primarily because only one conspiracy was alleged in the two complaints), *aff'd,* 803 F.2d 1197 (D.C. Cir.1986)*.*

In the case at bar, the arbitration panel concluded that Fidelity did not unlawfully restrain the Indii account. As the conduct of Fidelity was not found to be unlawful, there is no basis for concluding that the Rothfarb Defendants are liable for conspiring with the Fidelity or those in its employ. *See Discon Inc. v. NYNEX Corp.*, 86 F.2d at 167 ("Claim preclusion mandates that where there are only two alleged co-conspirators and claims grounded in conspiracy against one are

42

dismissed on the merits, there is no longer a co-conspirator or a basis for asserting conspiracy against the remaining defendant.") (internal quotation marks and citation omitted)).

Our conclusion in this regard is narrow. Although the conspiracy charges of the complaint in this context allege that the Rothfarb Defendants conspired with the Fidelity Defendants, those causes of actions can also be construed as asserting that Bill Rothfarb and Evan Rothfarb engaged in their own conspiracy, one separate and apart from the conspiracy they are alleged to have entered with the Fidelity Defendants. *See, e.g.,* Doc. [6-1] at ¶ 24 (count II) ("Defendants FIDELITY, Michael Shannon, Michael Hoenig, Evan Rothfarb, Bill Rothfarb, and Katherine Ho tortiously conspired . . ."). Therefore, the FINRA arbitration is res judicata at to counts II, IV, VI, VIII, X and XII against the Rothfarb Defendants to the extent those causes of action allege that the Rothfarb Defendants acted within the scope of a conspiratorial relationship with the Fidelity Defendants; however, the FINRA arbitration is not res judicata as to those causes of action to the extent they may be liberally construed as alleging that Bill Rothfarb and Evan Rothfarb engaged in their own conspiracy.

Although the FINRA arbitration is res judicata as to claims based on a Rothfarb-Fidelity conspiracy, it is not res judicata as to counts I, III, V, VII, IX, XI, XIII and XIV of the complaint since those claims are not predicated on the allegation that the Rothfarb Defendants conspired with the Fidelity Defendants. We conclude, however, that the rulings of the Connecticut Superior Court (Mottolese, J.), docs. [39-4], [39-6], are res judicata as to Plaintiffs' claims against the Rothfarb Defendants in counts XI through XIV of the complaint, which are based on "attempted extortion" or "conspiracy to attempt extortion." Doc. [6-1] (counts XI through XIV). In that prior litigation, Caro complained that in spite of the fact that Plaintiffs remitted $491,767.78 in November 2010, Bill

Rothfarb had neither released the judgment lien on Caro's property nor filed a satisfaction-piece in New York Supreme Court. Docs. [39-3], [39-5]. Consequently, he moved the court (Mottolese, J) for an order discharging the judgment lien and declaring the New York Judgement satisfied in full. *Id.*.

Like that prior action, the complaint in the present action asserts that the Rothfarb Defendants refused to discharge the judgment lien, and to file the satisfaction piece, unless they received additional payment from Plaintiffs. In that regard, counts XI through XIV allege that the Rothfarb Defendants attempted or conspired to extort an additional $200,000 during the interpleader action, and, thereafter, attempted or conspired to extort an additional $48,000 from Plaintiffs in April 2012.[12] Therefore, in both the prior action and the present action, Caro and/or Indii seek or sought redress for Bill Rothfarb's failure to release the judgment lien and file a satisfaction-piece. Both causes of action arise from the same nucleus of operative facts. It is immaterial that Plaintiffs' now style their claims in counts XI through XIV as "attempted extortion" or "conspiracy to attempt extortion" and seek recovery under a different legal theory. *See Malcom v. Board of Educ. of Honeoye Falls-Lima Cent*, 506 Fed. Appx. at 69; *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d at 875. The rulings of the Connecticut Superior Court (Mottolese, J) are therefore res judicata

---

[12] The complaint does not specify a date or time-frame with respect to the $200,000 extortion attempt. *See* Doc. [6-1] (counts XI, XII). In Caro's declaration, incorporated by reference, Caro states that "Evan Rothfarb demanded an additional $200,000 from the restrained funds (ordered released by Judge Jones) — else he would not file the mandated Satisfaction-Piece with the New York Count Clerk and would tie the interpleader matter up in court for five years. Acting in concert, Michael Shannon wrote to the Court on May 6th, 2011, seeking an order to withhold ALL of Indii's funds pending the Court's decision on Attorneys' fees . . . " Doc. [6-1] (Caro Declaration at 14). Based on the allegation that Evan Rothfarb acted in concert with Shannon, it would appear that the complaint alleges the Rothfarb Defendants attempted to extort $200,000 sometime during the course of the proceedings in the interpleader action.

as to the claims against the Rothfarb Defendants asserted in counts XI through XIV of the complaint. Those claims will be dismissed.

### 2. Collateral Estoppel

We next consider whether the remainder of the claims against the Rothfarb Defendants are precluded under the doctrine of collateral estoppel and whether the claims against the Fidelity Defendants are, *a fortiori*, subject to dismissal pursuant to that doctrine.

Collateral estoppel precludes a party from relitigating in a subsequent proceeding an issue of law or fact that has already been decided in a prior proceeding.  A party is collaterally estopped from relitigating an issue if a four-part test is met: "(1) the identical issue was raised in a previous proceeding; (2) the issue was 'actually litigated and decided' in the previous proceeding; (3) the party had a 'full and fair opportunity' to litigate the issue; and (4) the resolution of the issue was 'necessary to support a valid and final judgment on the merits.'" *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997) (quoting *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368 (2d Cir.1995)); *accord Boguslavsky v. Kaplan*, 159 F.3d at 720.

### i. Rothfarb Defendants

Apart from the claims Plaintiffs assert against the Rothfarb Defendants which are based on the allegations that the Rothfarb Defendants attempted to extort additional monies from Plaintiffs during the interpleader action and in April 2012 (i.e, counts XI-XIV of the amended complaint), the balance of Plaintiffs' claims against the Rothfarb Defendants (i.e., counts I-X) are premised on the allegation that the Rothfarb Defendants acted unlawfully in connection with the restraint of the Indii account.  Because the Rothfarb Defendants were not Fidelity employees with access to Fidelity's accounts so as to  restrain the Indii account themselves, the only facts alleged in the complaint which

45

permit the inference that the Rothfarb Defendants acted unlawfully in connection with the restraint of the Indii account are those which suggest the Rothfarb Defendants defrauded the New York State Supreme Court by obtaining the July 2010 and August 2010 restraining notices they served on Fidelity.  Toward that end, Plaintiffs assert that the August 2010 restraining notice was "improper[]" and served without "leave of [c]ourt."  Doc. [6-1] at ¶ 11.  The complaint contains no similarly pointed allegation as to the validity of the July 2010 restraining notice, but its assertion that the New York Judgment was "fraudulently obtained" may be construed as a claim that the restraining notices born from that fraudulently obtained judgment were also defective.  *Id.* at ¶ 4.  Both theories were pressed by Plaintiffs in prior litigations and proved unavailing.

As explained *supra*, the Connecticut Superior Court (Brazzel-Massaro, J.), in denying Plaintiffs' motion to set aside the domesticated judgment, carefully considered and rejected Plaintiffs' arguments that the New York Judgment was procured by fraud or otherwise defective.  *See* Doc. [29-7].  Plaintiffs had a full and fair opportunity to litigate the issue of the validity of the New York Judgment.  The court decided the question in Bill Rothfarb's favor.  Plaintiffs are therefore collaterally estopped from arguing that the Rothfarb restraining notices were defective because they were based on a judgment fraudulently obtained.

We reach the same conclusion with respect to the validity of the August 2010 restraining notice.  In their submissions to the FINRA arbitration panel, and again in connection with their motion to vacate the arbitration award made to this Court, Plaintiffs alleged that the August 2010 restraining notice was improper and served without leave of the New York State Supreme Court (Gische, J.) at the Order to Show Cause hearing held in that court on August 26, 2010.  Doc. [29-20] at ¶¶ 13-14; Doc. [29-21] at 7-8.  Although the written Award of the arbitration panel does not

46

indicate whether the arbitration panel made a specific finding as to whether the August 2010 restraining was improper, this Court carefully considered Plaintiffs' claim in that regard and concluded that the August 2010 restraining notice "was properly issued and that the arbitration panel did not act in manifest disregard of the law in failing to find otherwise." *Caro v. Fid. Brokerage Servs., LLC,*, 2014 WL 3907920 at *5. Any question as to the validity of the July 2010 and August 2010 restraining notices have been resolved in Defendants' favor. Because the remainder of the claims against the Rothfarb Defendants are predicated on the allegation that they defrauded the New York Supreme Court in obtaining either the New York Judgment or the restraining notices issued thereafter, there is no basis to conclude that the Rothfarb Defendants acted tortiously in connection with the claims asserted in counts I through X of the complaint. Those claims will be dismissed.

### ii.   Fidelity Defendants

The majority of Plaintiffs' claims against the Fidelity Defendants are alternatively precluded on collateral estoppel grounds since the allegations of the complaint upon which a finding against Fidelity could be based have already been decided in Fidelity's favor. As explained above, this Court concluded that the second restraining notice was served with leave granted by Judge Gische of the New York State Supreme Court. Moreover, the FINRA arbitrators ruled in favor of Fidelity on Plaintiffs' claims of "breach of contract, breach of fiduciary duty, [and] illegal retention of funds." Doc. [29-22]. Counts I through X of the complaint are based on allegations that the Fidelity Defendants accepted service of an improper restraining notice, or acted unlawfully by restraining the Indii account or initiating the interpleader action. Because we have determined that the second restraining notice was not improperly served, and because the FINRA arbitrators determined that Fidelity did not illegally retain Indii's funds, or breach a contract with Plaintiffs or a fiduciary duty

47

owed to them by filing the interpleader action, Plaintiffs are collaterally estopped from bringing the claims asserted in counts I through X, which are premised on that allegedly tortious conduct.[13]

## E.   Statute of Limitations

We next consider the Rothfarb Defendants' claim that counts I through XII of the complaint should be dismissed on the ground that they are time-barred by Connecticut's three years statute of limitations for tort claims.[14]   The Fidelity Defendants have not also asserted the affirmative defense of the statute of limitations in their motion to dismiss.   The Second Circuit has held that the district courts should ordinarily refrain from considering that defense *sua sponte*.   *Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987) ("The statute of limitation is an affirmative defense under Fed. R. Civ. P. 8(c) that must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is waived if not properly pleaded. . . .   If a defendant fails to assert the statute of limitations defense, the district court ordinary should not raise it *sua sponte*.") (internal quotation marks and citations omitted)).   Therefore, in considering whether claims alleged in the complaint

---

[13] As indicated above, the complaint alleges in counts XI and XII of the complaint that Fidelity and Shannon "acted in concert" or "tortiously conspired" with Rothfarb Defendants to extort an additional $200,000 from Plaintiffs as evidenced by a May 6, 2011 letter Shannon wrote to the United States District Court for the Southern District of New York (Jones, J.) "seeking an order to withhold ALL of Indii's funds pending the Court's decision on Attorneys' fees." Doc. [6-1] at ¶¶ 51, 54 and (Caro Declaration at 14).   Plaintiffs apprised the FINRA arbitrators of Shannon's action in that regard in their pre-hearing brief.   Doc. [29-21] at 10.   The decision of the FINRA arbitrators is res judicata as to counts XI and XII against the Fidelity Defendants for the reasons stated in part II.D.1 of this Ruling.   Those counts are also arguably precluded by the doctrine of collateral estoppel. We stop short of that conclusion for while we may reasonable infer that the FINRA arbitrators concluded that Shannon's May 6, 2011 letter was not in furtherance of an extortion scheme, it is not clear on this record whether they made a specific finding in that regard.

[14] The Rothfarb Defendants do not claim that counts XIII and XIV are time-barred.   They acknowledge that the unlawful conduct alleged by Plaintiffs in those counts — that the Rothfarb Defendants "attempted to extort" and "conspired to attempt to extort" an additional $48,000 from Plaintiffs — allegedly occurred later, in April 2012.

48

are time-barred, we undertake that analysis only with respect to claims alleged against the Rothfarb

Defendants.

Connecticut's statute of limitations applies to the present action, notwithstanding the fact that

the complaint charges the Rothfarb Defendants with violations of "the common and statutory laws

of the States of Massachusetts, New York and Connecticut." Doc. [6-1] (counts I-XIV).  The

question of which state law governs the merits of the claims is unrelated to the procedural question

of the applicable state statute of limitations.  "Where a statute of limitation is considered *procedural*,

the law of the forum applies."  *Icahn v. Todtman, Nachamie, Spizz & Johns, P.C.,* No.

99cv11783(WHP), 2001 WL 1160582, at *5 (S.D.N.Y. Oct. 1, 2001) (citing *Somahomo v.*

*Somahomo,* 29 Conn. App. 392, 393 (1992)) ("The  established law of this state is that the statute

of limitations is procedural and, therefore, the law of the forum applies.").  *See also  Champagne*

*v. Raybestos-Manhattan, Inc.*, 212 Conn. 509, 525, 562 A.2d 1100 (1989) ("A statute of limitations

is generally considered to be procedural, especially where the statute contains only a limitation as

to time with respect to a right of action and does not itself create the right of action.") (internal

quotations and citation omitted); *Messler v. Barnes Group., Inc.*, No. CV 960560004, 1999 WL

61034, at *3 (Conn. Super. Feb. 1, 1999) (Connecticut courts will "apply the procedural law of the

forum state irrespective of the applicable body of substantive law."); *Doe No. 1 v. Knights of*

*Columbus*, 930 F. Supp. 2d 337, 352-53 (D. Conn. 2013) (citing same). Because statutes of

limitations are labeled "procedural" under Connecticut law, Connecticut courts traditionally apply

Connecticut's statute of limitations when the plaintiff pursues a common law cause of action.  *Id.*

(citing *Stuart & Sons, L.P. v. Curtis Pub. Co.*, 456 F.Supp.2d 336, 343 (D.Conn. 2006) ("Under

Connecticut's choice of law rules, if the underlying claim existed at common law, the statute of

49

limitations is considered procedural.); *see Doe No. 1 v. Knights of Columbus*, 930 F. Supp. 2d at 353 (collecting cases holding that the statute of limitations is procedural and governs in diversity actions).  Since this Court sits in Connecticut, the timeliness of Plaintiffs' claims is governed by Connecticut' statute of limitations.  *See* Conn. Gen. Stat. § 52-577 ("No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."); *see also Watts v. Chittenden*, 301 Conn. 575, 583 (2011).

A preliminary question arises as to when the statute of limitations for the claims asserted in counts I through XII began to run.  "[S]ection 52-577 is an occurrence statute, meaning that the time period within which a plaintiff must commence an action begins to run at the moment the act or commission complained of occurs."  *Farnsworth v. O'Doherty*, 85 Conn. App. 145, 149 (2004) (quotation marks and citation omitted).  The Connecticut Supreme Court has stated that "'[in] construing . . . General Statutes § 52-577, which allows an action to be brought within three years from the date of the act or omission complained of, we have concluded that the history of that legislative choice of language precludes any construction thereof delaying the start of the limitation period until the cause of action has accrued or the injury has occurred."  *Id.* (quoting *Fichera v. Mine Hill Corp.*, 207 Conn. 204, 212 (1988)).  "The relevant date of the act or omission complained of, as that phrase is used in § 52-577, is the date when the negligent conduct of the defendant occurs and not the date when the plaintiffs first sustain damage."  *Id.*

Because the complaint in the present action was filed on July 17, 2014, the wrongful act or omission of the Rothfarb Defendants of which Plaintiffs complain, must have occurred not earlier than three years prior to that date, or July 17, 2011.  The complaint alleges wrongful conduct of the Rothfarb Defendant occurring well before that date.  It alleges that the Rothfarb Defendants served

an improper restraining notice on Fidelity on August 26, 2010, and that in the preceding days, specifically on August 24 and August 25, 2010, Evan Rothfarb "engaged in an email exchange" with Shannon and Hoenig "in which they strategized how to obtain an order from the NYS Supreme Court that would restrain Indii's funds so as to preserve them for Fidelity's interpleader lawsuit." Doc. [6-1] (Caro Declaration at ¶ 50); *see* Doc. [6-1] at ¶ 9.  The email exchange beginning on August 24 raises the specter of a conspiracy.  That date therefore marks the beginning of the limitations period for counts II, IV, VI, VIII, X and XII, which all sound in conspiracy.  The limitations period for the remaining counts — trespass to chattel (count I), abuse of process and fraud (count III), breach of duty (count V), intentional interference with contractual relations (count VII), extortion (count IX), and attempted extortion (count XI) — began when the restraining notice was served on Fidelity on August 26, 2010.  It follows that Plaintiffs were required to bring each set of claims within three years of the date of occurrence; that is, the conspiracy claims were to be brought by August 24, 2013, and the remaining claims were to be brought by August 26, 2013.[15]  As the complaint in the instant action was filed on July 17, 2014, counts I through XII were brought almost a full year too late.  Therefore, the claims are time-barred, absent tolling or some other equitable consideration.

---

[15] The Rothfarb Defendants argue that the limitations period began on July 16, 2010, when they served the first restraining notice on Fidelity.  Plaintiffs in their opposing papers concede that the Rothfarb Defendants' service of the July restraining notice was not itself wrongful, and argue that the Rothfarb Defendants' "actionable behavior began when they first conspired with the Fidelity Defendants, sometime between August 5th and the dates of their first emails between Evan Rothfarb and . . . Shannon and Hoenig wherein they jointly drafted the improper second restraining notice and conspired to serve and process it."  Doc. [51] at 23.  While the complaint alleges that Fidelity improperly acted upon the July 16, 2010 restraining notice, it does not specifically allege that the Rothfarb Defendants service of the restraining notice on Fidelity was improper.  Therefore, we conclude that the limitations period with respect to the Rothfarb Defendants started when they served the second restraining notice on Fidelity or conspired to serve it.

In their opposition to Defendants' motion to dismiss, Plaintiffs offer several theories in support of their contention that their claims are timely: (1) that the limitations period has been tolled by a stay issued by this Court in the FINRA confirmation lawsuit lasting 233 days and a stay issued by the United States District Court for the Southern District of New York in the interpleader action last 136 days; (2) that their claims are saved by Connecticut's accidental failure of suit statute, Connecticut General Statutes § 52-592; and (3) that the statute of limitations for many of the claims have not begun to run since the wrongful conduct of the Rothfarb Defendants is ongoing.

These three theories are introduced for the first time in Plaintiffs' opposition to Defendants' motion to dismiss.  The  complaint does not contain well-pleaded facts in support of those theories sufficient to save Plaintiffs' claims.  *See Davis v. Hunt Leibert Jacobson, P.C.*, No. 3:12cv1102 (JBA), 2014 WL 5798585, at *8 (D. Conn. Nov. 7, 2014) (stating "facts supporting equitable tolling must be pleaded in the complaint").  For the sake of completeness, the Court will nevertheless consider the arguments made by Plaintiffs in support of their contention that the present action is timely.

Plaintiffs argue that their claims against the Rothfarb Defendants based on "extortion" (count IX), "conspiracy to commit extortion" (count X), "attempted extortion" (count XI) and "conspiracy to attempt extortion" (count XII) "are not subject to time limitations because the Rothfarbs continue to hold monies extorted from Caro and continue to demand extortion in return for filing satisfaction with the Connecticut Court for the domesticated judgment."  Doc. [42] at 27; *see* Doc. [51] at 23. Plaintiffs also suggest that their claims for "abuse of process and fraud" (count III) and "conspiracy to abuse process and commit fraud" (count IV) likewise qualify as "'continuing behavior' . . . because the goals and fruits of abuses were in furtherance of their extortions."  Doc. [51] at 23.

"Though the result of a conspiracy may be continuing, the conspiracy does not thereby become a continuing one.  Continuity of action to produce the unlawful result, or . . . 'continuous co-operation of the conspirators to keep it up' is necessary."  *United States v. Grimm*, 738 F.3d 498, 504 (2d Cir. 2013) (quoting *Fiswick v. United States*, 329 U.S. 211, 216 (1946) (citations omitted)).  The complaint does not include well-pleaded allegations in support of an ongoing conspiracy between either Evan Rothfarb and Bill Rothfarb or, alternatively, between the Rothfarb Defendants and the Fidelity Defendants.  Therefore, the continuing course doctrine does not apply to the claims based on conspiracy asserted in counts IV, X and XII.  With respect to the claims based on abuse of process and fraud, attempted extortion, and extortion,  the continuing conduct doctrine is "generally limited to when there exists a 'special relationship' between the parties or where there have been later wrongful acts."  *AT Engine Controls Ltd. v. Goodrich Pump & Engine Control Sys., Inc*., No. 3:10cv01539 (JAM), 2014 WL 7270160, at *14 (D. Conn. Dec. 18, 2014); *Stuart v. Snyder*, 125 Conn. App. 506, 510-11 (2010) ("Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission relief upon, there has been *evidence* of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act.").  The complaint, with respect to the claims of abuse of process and fraud, attempted extortion, and extortion, does not contain well-pleaded allegations of a special relationship giving rise to a continuing duty.  Moreover, those claims do not allege some later wrongful conduct of the Rothfarb Defendants that were related to a prior act.  For example, the complaint alleges with respect to the extortion claim, a one time-occurrence: that Defendants "acted in concert to extort $491,767.78 from Plaintiff Caro."  Doc. [6-1] at ¶ 45.  No subsequent threat associated with an extortion claim is alleged in connection with that

claim.  Similarly, the attempted extortion claim is based on Defendants alleged "attempt to extort $200,000 from Plaintiff Indii." *Id.* at ¶ 51.  That claim is also predicated on a single event.  Finally, the abuse of process and fraud claim alleges Defendants' "abuse [of] civil process in New York" in connection with restraining notices and interpleader action in the latter half of 2010.  *Id.* at ¶ 27.  Therefore, all three claims allege discrete activity, not ongoing tortious conduct.  Furthermore, the conduct alleged in connection with each claim is not alleged to have occurred within three years of the service of the complaint.  Accordingly, the timeliness of counts III, IV, IX, X, XI and XII of the complaint is not preserved or saved by any ongoing activity.[16]

Plaintiffs claim also that the doctrine of equitable tolling renders the present action timely.  "Equitable tolling is a form of discretionary relief that can be awarded upon consideration of all the facts and circumstances."  *Carter v. Univ. of Connecticut*, No. 3:04cv1625 (SRU), 2006 WL 2130730, at *2 (D. Conn. July 28, 2006) *aff'd*, 264 F. App'x 111 (2d Cir. 2008).  The Second Circuit "has applied the doctrine as a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights, or h[as] asserted his rights in the wrong forum."  *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal quotation marks and citations omitted).  To equitably toll a limitations period, a party "must show that extraordinary circumstances prevented him from filing his [complaint] on time, and he must have acted with reasonable diligence

---

[16] Moreover, the mere fact that the Rothfarb Defendants "continue to hold monies extorted from Caro" does not toll the limitations period.  Doc. [42] at 27.  The statute of limitations for such a claim, which would in essence be a claim for conversion, would "accrue at the moment of conversion" and would not be considered a continuing offense.  *Lennon v. Seaman,* 63 F. Supp. 2d 428, 440 (S.D.N.Y. 1999) (analyzing timeliness of conversion claim under New York law).  Assuming, *arguendo*, that the complaint alleged a claim based on conversion, that claim would be time-barred since the statute of limitations for such a claim could begin not later than late in November 2010, when Plaintiffs are alleged to have remitted $491,767.78 to Bill Rothfarb.  Doc. [39-1] at 2; Doc. [39-2] at 1.

throughout the period he seeks to toll." *Hizbullahankhamon v. Walker,* 255 F.3d 65, 75 (2d Cir.2001), *cert. denied*, 536 U.S. 925 (2002); *see Smith v. McGinnis*, 203 F.3d, 17 (2d Cir. 2000) (*per curiam*) ("Equitable tolling applies only in the rare and exceptional circumstance").

In *Gerena v. Korb*, 617 F.3d 197 (2d Cir. 2010), the Second Circuit stated in dicta that "the possibility that equitable tolling might apply here is foreclosed by Connecticut precedent, which establishes Conn. Gen. Stat. § 52-577 as a statute of repose not susceptible to equitable tolling." 617 F.3d at 206 (quoting *Carter v. Univ. of Connecticut*, No. 3:04cv1625 (SRU), 2006 WL 2130730 (D. Conn. July 28, 2006) *aff'd*, 264 F. App'x 111 (2d Cir. 2008)).  In support of that statement, the Court of Appeals cited the district court's decision in *Carter v. University of Connecticut*.  In that case, Judge Underhill concluded that § 52-577 was not subject to equitable tolling after analyzing Connecticut appellate authority and observing that § 52-577 had "never been held by an appellate court of Connecticut to be subject to the doctrine of equitable tolling."  *Carter v. Univ. of Connecticut*, No. 3:04cv1625 (SRU), 2006 WL 2130730 at *3.  We agree with Judge Underhill's analysis of Connecticut appellate authority, and adopt that reasoning in this case.

We note, in any event, that Plaintiffs overstate the preclusive effect of the stays issued by the United States District Court for the Southern District of New York in the interpleader action and the stay issued by this Court in the FINRA confirmation lawsuit.  On September 8, 2010, the United States District Court for the Southern District of New York issued an order directing Plaintiffs and the Rothfarb Defendants to show cause why Fidelity's request for interpleader relief should not be granted.  The court stated in that order that "pending the hearing of Fidelity's application . . . Defendants are temporarily restrained and enjoined from instituting or prosecuting any proceeding in any State or United States court affecting the Indii.com Account until further order of this Court

. . ." Doc. [42-7] (Order to Show Cause) at 2. On October 22, 2010, that court issued an Order "to clarify the Court's directions to the parties," stating "all actions involving the parties, including the one before this Court, are stayed pending a decision on the issue of jurisdiction." *Id.* (Order). In its November 24, 2010 Memorandum and Order resolving the jurisdictional dispute and granting Fidelity's request for interpleader relief, the court vacated the stay issued on October 22, 2010. *Id.* (Memorandum and Order) at 5 ("On October 22, 2010, the Court stayed all actions involving the parties pending a decision on the issue of jurisdiction in this case. That order is VACATED.")

Plaintiffs argue that the court's November 24 order vacating the October 22 stay, left the September 8 stay intact, and that consequently, they were enjoined from prosecuting the present action until the interpleader case was closed on April 22, 2011. That argument is not founded in any plausible reading of the orders of the interpleader court. That court's October 22 order stayed "all actions involving the parties." When that universal prohibition on filing other actions was lifted by the court on November 24, Plaintiffs were free to prosecute claims affecting the restraint of the Indii account in a separate action, or alternatively, to assert counterclaims against Defendants in the interpleader action. Accordingly, the stay issued by the interpleader court lasted from September 8, 2010, to November 24, 2010, and no longer.

Plaintiffs contention that this Court prevented them from asserting the instant claims by issuing a stay in their lawsuit seeking to vacate the FINRA arbitration award is also unavailing. Shortly after Plaintiffs instituted the FINRA lawsuit against Fidelity in this Court, they filed on October 25, 2012, a motion to amend their complaint and a proposed amended complaint, seeking to name  Bill Rothfarb, Evan Rothfarb and Ho, Hoenig and Shannon as additional defendants and to charge them with several of the violations of state common and statutory law alleged in the

present action. *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv1066 (CSH), (D. Conn.), Doc. # 25 (Motion to Amend Complaint by Marshall Caro, filed Oct. 25, 2012). On November 20, 2012, Fidelity filed a motion to stay the proceeding and thereby to suspend judgment on the motion to amend the complaint on the ground that Plaintiffs' proposed amended complaint would be "mooted or at least narrowed by the determination of the core issue of confirmation of the award." *Id.* at doc. [30]. Acknowledging the possibility that resolution of the parties' cross-motions to vacate and confirm the arbitration award would preclude litigation of any additional claims, the Court on December 6, 2012, granted Fidelity's motion to stay. *Id.* at doc. [39]. The court stated: "all proceedings *in this case* are STAYED, pending the Court's Ruling disposing of the cross-motions to vacate or confirm the award of the FINRA arbitrators." *Id.* (emphasis added).

In a letter to the Court dated July 10, 2013, Caro conveyed his perception that the statutory period within which to assert the proposed claims was coming to a close, and asked the Court whether he should proceed with his motion to amend the complaint or withdraw it and file the amended complaint in a separate or "new" action. *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv1066 (CSH), 2013 WL 3929708, at *1 (D. Conn. July 26, 2013). In response to Caro's letter, the Court issued its July 26, 2013 Ruling denying Plaintiffs' motion to amend the complaint without prejudice to their right "to file a timely action in another court of competent jurisdiction" or "renew their motion to amend their petition and complaint in this Court" provided they "propose an amended complaint with allegations as to the citizenship of the parties which are sufficient to demonstrate that full diversity of citizenship exists between all plaintiffs and all defendants in the action." 2013 WL 3929708, at *7. In a subsequent Order dated October 7, 2013, the Court determined that it had "diversity of citizenship" subject matter jurisdiction over the action and stated that "the proceedings

remains stayed pending the Court's Ruling disposing of the . . . cross-motions to vacate or confirm the award of the FINRA arbitrators." *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv1066 (CSH), (D. Conn.), Doc. # 48 (Order, dated Oct. 7, 2013). Plaintiffs did not renew their motion to amend the complaint; rather, they filed the present action on July 17, 2014. The Court issued its Ruling on the parties' cross motions to vacate or confirm the arbitration award on August 11, 2014. *See Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv01066 (CSH), 2014 WL 3907920 (D. Conn. Aug. 11, 2014)

The foregoing recital of the procedural history in the FINRA confirmation lawsuit reveals the following. First, the stay issued by the Court its December 6, 2012 Order applied only to the assertion of additional claims in that action. That Order did not prohibit Plaintiffs from asserting their claims against the Rothfarb Defendants in another court of competent jurisdiction. Second, Caro was aware as of July 10, 2013, that the statutory period within which to assert those additional claims was drawing to a close. Third, the Court's July 26, 2013 Ruling on Plaintiffs' motion to amend the complaint, which was issued one month before the statutory period expired, expressly advised Plaintiffs that they were "at liberty to file a timely action in another court of competent jurisdiction" or "renew their motion to amend in this Court." *Caro v. Fid. Brokerage Servs., LLC*, 2013 WL 3929708, at *7. Almost an entire year passed before Plaintiffs filed the present action on July 17, 2014. Even if § 52-577 were subject to equitable tolling, it could not be said that Plaintiffs acted "with reasonable diligence throughout the period [they] seek[] to toll." *Hizbullahankhamon v. Walker,* 255 F.3d at 75.[17]

_____

[17] Moreover, assuming *arguendo* that § 52-577 was susceptible to equitable tolling and that Plaintiffs were in fact enjoined from bringing the instant claims by a stay issued by the court in the federal interpleader action lasting from September 8, 2010, to November 24, 2010 (or 77 days), and

Plaintiffs also argue that the otherwise untimely claims in counts I through XII are saved by Connecticut General Statutes § 52-592, the accidental failure of suit statute. Section 52-592 states in relevant part: "If any action, *commenced within the time limited by law*, has . . . been otherwise avoided or defeated . . . because the action has been dismissed for want of jurisdiction . . . or for any matter of form . . . the plaintiff . . . may commence a new action . . . for the same cause at any time within one year after the determination of the original action . . ." Conn. Gen. Stat.§ 52-592(a) (emphasis added). Plaintiffs contend that the statute saves their claims because: (1) they filed within the limitations period a motion to amend their complaint and a proposed amended complaint in the FINRA confirmation lawsuit before this Court, in which they named Bill and Evan Rothfarb as defendants and sought to assert many of the claims alleged in the present action; and, (2) they filed the present action within one year of the Court's Ruling denying without prejudice their motion to amend the complaint. The Rothfarb Defendants contend that § 52-592 is inapposite to the case at bar because the "statute applies only to dismissal of 'actions' filed within the statutory period (not motions to amend pleadings) and it is strictly construed." Doc. [46] at 10. Plaintiffs argue that their proposed amended complaint qualifies as an "action" within the meaning of § 52-592(a) since that term has been held to encompass counterclaims. Doc. [51] at 25-26. That argument is not well-founded. Counterclaims may constitute new "actions" as the term is used in § 52-592(a) — motions may not. *See  Caro v. Weintraub*, No. 09cv1353 (CSH), Doc. 154 (Oct. 25, 2011) ("Although motions to cite in additional defendants are not 'new action[s]' saved by [§ 52-592(a), *Aqleh v.*

---

a stay issued by this Court in the FINRA confirmation lawsuit lasting from December 6, 2012, to July 26, 2013 (or 232 days), the instant claims would still be untimely.  A period of equitable tolling lasting 309 days (the sum of 77 and 232 days) would extend the three year limitations period ending on August 26, 2013, to July 1, 2014.  As noted above, the complaint was filed on July 17, 2014.

*Cadlerock Joint Venture II, L.P.*, 299 Conn. 84, 10 A.3d 498 (2010),] counterclaims are, *see Pacelli Bros. Transp. Inc. V. Pacellli*, 189 Conn. 401, 411-12, 456 A.2d 325 (1983).").

The plain language of § 52-592(a) states that it applies only to original actions "commenced within the time limited by law. . . ."  Conn. Gen. Stat.§ 52-592(a).  There is no doubt that Plaintiffs filed their proposed amendment in the FINRA confirmation lawsuit within the three year limitations period.  The question is whether in doing so, they commenced an action within the meaning of § 52-592(a).  In *Aqleh v. Cadlerock Joint Venture II, L.P.* the Connecticut Supreme Court held that a motion to cite in an additional defendant did not constitute an "action" within the meaning of § 52-592(a).  *Aqleh v. Cadlerock Joint Venture II, L.P.,* 299 Conn. at 97.  The court started its analysis by analyzing the plain language of the statute.  *Id.* at 91-92; *see also* Conn. Gen. Stat. § 1-2z ("The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. . . .").  It noted that while "an 'action' is something that is 'commenced.' . . . [n]o one is said to 'commence' a motion." *Id.* at 93.  The court went on to explain that the phrase "within the time limited by law" is a phrase that refers to the time in which an action must be filed, whereas a motion need only be filed timely.  *Id.* ("While a motion must be filed timely, an action must be commenced "within the time limited by law," meaning it must be brought within the applicable statute of limitations.").  Citing other language of the statute using the terms "'*verdict*, '*judgment*'. . .'*rendered*' [and] . . .'*reversed*,'" the court reasoned that "§ 52-592(a) refers to outcomes traditionally associated with the resolution of an action."  *Id.* at 92 (emphasis in original).  Furthermore, the court analyzed related statutes and confirmed that other "civil action statutes refer to actions and motions as separate and distinct happenings, with the motion occurring during or as part of the action." *Id.* at 94-95.  The distinction between an action and a motion, the court

60

explained, was also apparent by the fact that a "motion to cite in or add new parties . . . does not provide a separate basis for judgment"; rather, "[f]or that to occur, the complaint must be amended to allege a cause of action for or against them." *Id.* at 96.

The court's analysis in *Aqleh* applies to this case.   In *Aqleh* the motion at issue was a motion to cite in additional party.   In the FINRA arbitration confirmation lawsuit, Plaintiffs filed a motion for leave to amend their complaint and a proposed amended complaint.   Both motions sought to name an additional defendant or defendants.   Plaintiffs' motion for leave to amend the complaint in the FINRA confirmation lawsuit also sought to assert claims against Bill and Evan Rothfarb.   That is a distinction without a difference for purposes of the present analysis.   Neither motion "commence[d] an action" within the meaning of § 52-592(a).

The conclusion is not at odds with authority indicating that counterclaims are considered actions under the statute.  *See  Caro v. Weintraub*, No. 09cv1353 (CSH), Doc. 154 (Oct. 25, 2011) (citing *Pacelli Bros. Transp. Inc. V. Pacelli*, 189 Conn. at 411-12).   A counterclaim must be pleaded, and is not made by motion.  *See* Fed. R. Civ. P. 13.   Furthermore, in *Aqleh* the court noted that "[s]ection 52-592(d) expressly provides that [section 52-592(a)] applies only to one type of pleading other than a new action — a cross complaint filed by any defendant in the action." *Id.* at 504.   The court explained that "[i]f the legislature had intended § 52-592(a) similarly to apply to a motion to cite in an additional party, it easily could have provided so expressly, and the fact that it did not is strong evidence that it did not so intend." *Id.* at 504.   The fact that the legislature did not expressly state that § 52-592(a) applies to a motion for leave to amend a complaint, is therefore strong evidence that it did not intend for the statute to apply to such a motion.   Because a motion for leave to amend the complaint is not an "action" within the meaning of § 52-592(a), counts I through

61

XII of the complaint are not saved by the Connecticut's accidental failure of suit statute

**F.    Minimum Pleading Requirements**

The Defendants next argue that separate and apart from any of the foregoing defects, the complaint fails to plead facts sufficient to state claims upon which relief can be granted.  That final basis for dismissal requires us to determine, in the first instance, the state law that governs the complaint.

**1.    Choice of Law - Substantive**

"When a federal district court sits in diversity, it generally applies the law of the state in which its sits, including that state's choice of law rules."  *In re Coudert Bros. LLP*, 673 F.3d 180, 186-87 (2d Cir. 2012)  (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496-97 (1941)).  *Accord Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) ("The district court was sitting in diversity, and so it properly applied the choice of law rules of . . . the forum in which it sits.").  Because this Court sits in Connecticut, Connecticut is the relevant forum.  Connecticut applies the substantive law of the state with the most significant relationship to the lawsuit. *Jaiguay v. Vasquez*, 287 Conn. 323, 349 (2008).  *See also Glenwood Systems, LLC v. Med-Pro Ideal Solutions, Inc.,* 438 F. App'x 27, 29  (2d Cir. 2011); *Almonte v. New York Medical College*, 851 F.Supp. 34, 39 (D.Conn. 1994) (citing *O'Connor v. O'Connor*, 201 Conn. 632, 650  (1986) (quoting Restatement (Second) Conflicts of Laws § 145)).

To determine the forum with the most significant relationship in the context of a tort case, the court considers "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is

centered." *O'Connor*, 201 Conn. at 652 (quoting Restatement (Second) Conflicts of Law § 145(2) and citing *id.*, §6).

In the case at bar, there are significant contacts with both Connecticut and New York. The question of which law applies is not usefully informed by the citizenship of the parties, since the parties are domiciled in Connecticut, New York and Massachusetts. The place where Plaintiffs' purported injury occurred, the place where that injury was caused, and the place where the relationship between the parties is centered, better informs the question. Inasmuch as the restraint of the Indii account may have injured Plaintiffs, the injury may be said to have occurred in Connecticut, where Caro and Indii are citizens, and where they perceived themselves to be injured. *See Sack v. Low*, 478 F.2d 360, 366 (2d Cir. 1973*)* (stating "a cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally the plaintiff's residence"). New York is the state where the conduct causing the restraint of the Indii occurred. It is where the restraining notices were issued and where the Order to Show Cause hearing in New York State Supreme Court (Gische, J.), interpleader action in the United States District Court for the Southern District of New York (Jones, J.) and FINRA arbitration, were held. To the extent the relationship between the parties is centered anywhere, it is largely centered in New York, the situs of litigation. Accordingly, counts I through XII of the complaint will be analyzed under New York law.

The analysis differs slightly with respect to counts XIII and XIV, which allege that the Rothfarb Defendants attempted or conspired to extort an additional $48,000 from Plaintiffs in April 2012, by refusing to lift the judgment lien on Caro's property in Greenwich and to file the satisfaction piece for the New York Judgment. The complaint alleges that as a result of those extortion attempts,

Plaintiffs were "obliged to retain [the law firm of] Ury & Moscow." Doc. [6-1] at ¶ 69. As noted above, Plaintiffs thereafter filed a motion in Connecticut Superior Court (Mottolese, J.), requesting a court order releasing the judgment lien and declaring the New York Judgment satisfied. Doc. [39-3] at 5. At that point, the center of the relationship between Plaintiffs and the Rothfarb Defendants arguably shifted to Connecticut. As the complaint alleges that the Rothfarb Defendants attempted to extort Plaintiffs by refusing to release the judgment lien, Connecticut is also arguably the place where Plaintiffs' alleged injury was caused.

In consequence, the Court will apply the substantive law of Connecticut in analyzing Plaintiffs extortion-related claims asserted in counts XIII and XIV.

### 2.     Analysis of the Complaint under the Law of New York or Connecticut

#### i.     Counts I and II - "Trespass to Chattel" & "Conspiracy to Trespass to Chattel"

Count I of the complaint sounds in trespass to chattel, alleging that the Fidelity Defendants and the Rothfarb Defendants "acted in concert to deny Plaintiff Indi the access to and use of its funds." Doc. [6-1] at ¶ 21. Count II alleges that Defendants "tortiously conspired" to trespass to chattel. *Id.* at ¶ 24.

"A trespass to chattel may be committed by intentionally . . . dispossessing another of the chattel, or . . . using or intermeddling with a chattel in the possession of another," Restatement (Second) of Torts § 217 (1965), where "the chattel is impaired as to its condition, quality, or value," *id.* at § 218(b). *See also City of Amsterdam v. Goldreyer Ltd.*, 882 F. Supp. 1273, 1281 (E.D.N.Y. 1995) (citing the Restatement definition as New York law). "One is privileged to commit acts which would otherwise be a trespass to a chattel or a conversion when he acts pursuant to a court order

which is valid or fair on its face." *Id.* at § 266.

The complaint does not plausibly allege that the Defendants' actions in connection with the restraint and liquidation of the Indii account were not privileged and in accordance with a court order that was "valid or fair on its face." *Id.*  The Rothfarb Defendants served Fidelity with restraining notices issued by the New York State Supreme Court.  Moreover, with respect to the second restraining notice, the New York State Supreme Court (Gische J.) directed the Rothfarb Defendants to serve it on Fidelity at the Order to Show Cause hearing.  Doc. [29-11] at 11-12.  In restraining the assets of the Indii account, the Fidelity Defendants were acting in accordance with the restraining notices.  Thereafter, when Fidelity deposited the funds of the Indii account into the court registry, it do so at the direction of the United States District Court for the Southern District of New York (Jones, J.).  Doc. [29-18] at 5.  Count I therefore fails to state a claim upon which relief can be granted for the additional reason that the actions of the Defendants were privileged by facially valid court orders.  Furthermore, as count I does not state a claim, count II, sounding in "conspiracy to trespass to chattel," also fails.  *See Filler v. Hanvit Bank*, 156 F. App'x 413, 418 (2d Cir. 2005) ("A claim of conspiracy cannot stand alone and must be dismissed if the underlying independent tort has not been adequately pleaded.").

> ii.   **Counts III and IV: "Abuse of Process and Fraud" and "Conspiracy to Abuse Process and Commit Fraud."**

Plaintiffs charge Defendants with "abuses of process and fraud" in count III of the complaint, and "conspiracy to abuse process and commit fraud" in count IV.  Count III alleges that the Fidelity Defendants and the Rothfarb Defendants "acted in concert to abuse civil process in New York and to commit frauds upon the New York and Federal Courts to deny Plaintiff Indii the access to and use

65

of its funds and to extort payment of the fraudulent Rothfarb judgment . . ."  Doc. [6-1] at ¶ 27. Count IV alleges that Defendants "tortiously conspired" to do the same.  *Id.* at ¶ 30.

To plead a claim of abuse of process under New York law, a plaintiff "must plead . . . that there was (1) regularly issued civil process, (2) an intent to do harm without excuse or justification, (3) use of process in a perverted manner to obtain a collateral objective, and (4) actual or specific damages."  *Mosdos v. Chofetz Chaim*, *Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 191, 212 (S.D.N.Y. 2014) (alterations and internal quotation marks omitted); *see also Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12cv974 (KMK), 2014 WL 5011047, at *30 (S.D.N.Y. Sept. 29, 2014) (same).

In the case at bar, Plaintiffs' allegations fail to satisfy the second and third elements.  The minimal allegations pleaded in direct support of count III do not identify a regularly issued civil process allegedly abused by Defendants.  Interpreting the complaint liberally, however, it appears that Plaintiffs have alleged that the Rothfarb Defendants abused process by serving restraining notices on Fidelity, and that Fidelity abused process by filing the federal interpleader action.  The complaint does not plausibly allege that either the Rothfarb Defendants or the Fidelity Defendants intended "to do harm without justification."  *Mosdos v. Chofetz Chaim*, *Inc. v. RBS Citizens, N.A.*, 14 F. Supp. at 212.   On the contrary, the court documents from the prior litigations reveal that the restraining notices served by the Rothfarb Defendants, and the federal interpleader action filed by the Fidelity Defendants, were justified.  The Rothfarb Defendants sought to restrain the assets of the Indii account in order to receive payment of the New York Judgment.  Fidelity filed the interpleader action because it was unable to determine whether Plaintiffs or the Rothfarb Defendants were entitled to the assets of the Indii account.  The propriety of Defendants' conduct was moreover

66

affirmed or authorized by the courts.  For instance, the United States District Court for the Southern District of New York (Jones, J.) granted Fidelity's request for interpleader relief.  Likewise, the New York State Supreme Court (Gische, J.) directed the Rothfarb Defendants to serve the second restraining notice.  The complaint also fails to allege that Defendants used some legal process in order to "'seek[] some collateral advantage . . . outside the legitimate ends of the process.'"  *Mosdos v. Chofetz Chaim*, *Inc. v. RBS Citizens, N.A.*, 14 F. Supp. at 212 (quoting *Bd. Of Educ. of Farmingdale Union Free sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc.*, 38 N.Y.2d 397 (1975)).  There are no plausible allegations in support of the conclusion that Defendants were using legal processes for purposes other than which they were intended.  86 N.Y. Jur. 2d Process and Papers §159 ("No cause of action is stated when process is used for its proper and legitimate purpose").  The complaint therefore does not state a claim for abuse of process for the additional reasons discussed in this subsection, and for those reasons, also fails to state a claim for conspiracy to abuse process.  *See Filler v. Hanvit Bank*, 156 F. App'x at 418.

Counts III and IV also charge Defendants with fraud.  When the complaint contains allegations of fraud, Federal Rule of Civil Procedure 9(b) requires that "the circumstances constituting fraud . . . be stated with particularity."  "Specifically, the complaint  must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Mills v. Polar Molecular Corp*., 12 F.3d 1170, 1175 (2d Cir. 1993).

The complaint contains alleged misstatements which, when viewed liberally, may be construed as supporting Plaintiffs' claim for fraud.  With respect to Evan Rothfarb, the complaint alleges:

67

> [T]he defendants were surprised at the [order to show cause hearing
> in New York State Supreme Court (Gische, J)] on August 26th, 2010.
> Judge Gische asked Mr. Shannon if a federal interpleader complaint
> had been filed.  When Mr. Shannon answered in the affirmative,
> Judge Gische ruled that she no longer had jurisdiction and denied
> Fidelity's and Rothfarb's request for an injunction against Indii.  Judge
> Gische asked Mr. Rothfarb if he had obtained another restraint (*from
> federal court*). *Mr. Rothfarb replied "It's in my bag".  This was a lie.
> No such restraint was ever served.*  Instead, by prearrangement
> between Mr. Rothfarb and Mr. Shannon, Mr. Rothfarb gave copies of
> a second (and improper) restraining notice to Shannon in violation of
> New York Procedure (CPLR 5222) . . .

Doc. [6-1] at ¶ 10 (emphasis added).  The italicized language in the preceding block quotation

alleges that the court asked Evan Rothfarb "if he had obtained another restraint from (from a federal

court)" and that Evan Rothfarb responded in the affirmative by stating "'It's in my bag.'"  In Plaintiffs

opposition to Defendants' motion to dismiss, they elaborate on this allegation only slightly,

explaining "Evan Rothfarb obtained leave of Judge Gische by deception to serve an improper

restraining notice against the Indii account . . . Rothfarb deceived the New York court by causing

her to believe that he had a proper restraint 'in his bag."  Doc. [42] at 19-20.

The allegation of Evan Rothfarb's alleged misstatement is conclusory.  It is not accompanied

by particularized facts explaining why Plaintiffs believe the statement is fraudulent.  Moreover, the

record of the Order to Show Cause hearing does not support the conclusion that the court asked Evan

Rothfarb if he obtained another restraint from a *federal court*.  In fact, there is no reference

whatsoever to a restraining notice issued by a federal court in the Order to Show Cause hearing

transcript.  *See* Doc. [29-11].  Consequently, there is no basis from which to conclude that the state

court was under the misapprehension that it was somehow directing service of a restraining notice

issued by a federal court.  On the contrary, the court marked the Order to Show Cause hearing

68

resolved pursuant to a stipulation between Fidelity and Bill Rothfarb, in which Fidelity agreed to

"accept immediate service of a new restraining notice against [the Indii account] issued pursuant to

N.Y. C.P.L.R. 5222 and 5222-a."  Doc. [29-12] at 2.  The stipulation does not reference service of

a federal restraining notice.   Furthermore, the hearing transcript contradicts the more general

suggestion that the court directed service of the restraining notice under pretenses conceived by the

parties to deceive the court.  The parties advised the court that the first restraining notice was set to

expire as a result of exemption notices filed by Plaintiffs and, accordingly, requested equitable relief

designed to continue the restraint on the Indii account.  Doc. [29-11] at 20-11.  Plaintiffs' claim of

fraud against the Rothfarb Defendants is completely without merit.

The complaint also alleges that Shannon made a misrepresentation to the United States

District Court for the Southern District of New York, by stating the following in his December 23,

2010 affidavit in support of Fidelity's application for attorney's fees:

> Defendant Bill Rothfarb ("Rothfarb") claims to be entitled to funds
> of the Indii.com account by virtue of a judgment in favor of Rothfarb
> against defendant Marshall Caro ("Caro") in a New York  State civil
> action entitled Bill Rothfarb v. Programit, Inc. et al.

Doc. [6-1] (Declaration at ¶61).  The complaint alleges that "[n]o such claims were made by the

Rothfarbs" and that Shannon had "known [the statement] to be false" when he signed the affidavit.

*Id.*  The complaint continues on to allege that the falsity of the statement is evidenced by Evan

Rothfarb's affidavit submitted in connection with the Order to Show Cause hearing in New York

State Supreme Court (Gische, J.) in which Evan Rothfarb stated:

> [I]t appears that Mr. Caro may be using the corporate form to advance
> his personal interests in disguise and to evade creditors.  Moreover,
> Fidelity is likely holding fraudulently conveyed assets by the
> judgment debtor Mr. Caro in an amount excess of the value of

69

> plaintiff's judgment against Mr. Caro.  If accurate, the accounts with
> Fidelity containing these fraudulent conveyances are subject to
> restraint because they contain non-exempt personal property of the
> judgment debtor Marshall Caro.

*Id.*  Quoting from the affidavit of Evan Rothfarb, the complaint states: "'It appears . . . may be . . . likely . . . if accurate' Evan Rothfarb advanced his suspicions, not a claim."  *Id.*

Plaintiffs' assertion that Shannon misrepresented the position of Bill Rothfarb with respect to his entitlement to the funds of the Indii account is divorced from reality.  The sworn statement of Evan Rothfarb, in which he conveys his belief that certain Fidelity accounts "are subject to restraint," does not contradict, but rather directly supports Shannon's assertion that "Bill Rothfarb . . . claims to be entitled to the funds of the Indii account."

What appears to be the primary source of Plaintiffs' frustration is revealed in their opposition to Defendants to motion to dismiss.  Plaintiffs explain that "[t]he Fidelity defendants deceived the [United States District Court for the Southern District of New York] by asserting that *all* of the assets in the Indii account were the subject of the dispute and by requesting that *all* of the positions in this be liquidated."  Doc. [42] at 17 (emphasis added).  The only well-pleaded allegation in support of that assertion is Shannon's above-cited statement indicating his belief that "Bill Rothfarb . . . claims to be entitled to the funds of the Indii.com account."  Doc. [6-1] (Declaration at ¶61.  Not only is Shannon's statement not a misrepresentation of the Bill Rothfarb's position, the timing of that statement is such that it could not have injured Plaintiffs by influencing the court's decision to restrain the Indii account.  Shannon made the statement in connection with his December 23, 2010 motion for attorneys' fees, which was roughly one month after the court granted Fidelity's request for interpleader relief.  Doc. [29-8] at 6.  We therefore conclude that to the extent counts III and IV

of the complaint may be construed as alleging claims sounding in fraud, those claims do not state a claim upon which relief can be granted for the additional reasons discussed in this subsection.

### iii.   Counts V and VI: "Breach of Duty" and "Conspiracy to Breach Duty"

Counts V and VI sound in "breach of duty" and "conspiracy to breach duty."  In support thereof, the complaint alleges that Defendants "acted in concert to breach Fidelity's duty to permit Indii access to and use of its funds" and "tortiously conspired" for that purpose.  Doc. [6-1] at ¶¶ 33, 36.  No duty giving rise to a special standard of care is alleged in support of that claim; however, we liberally construe the complaint as alleging a cause of action based on breach of a fiduciary duty. To establish a claim for breach of fiduciary duty, in New York, a plaintiff must show (1) the existence of a fiduciary duty; and (2) breach of that duty.  *See EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 19-22, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005).  A breach of fiduciary duty is established by a showing of misconduct by the defendant.  *See Armentano v. Paraco Gas Corp.*, 90 A.D. 3d 683, 684-85, 935 N.Y.S.2d 304 (2d Dep't 2011) (internal quotation marks and citation omitted).

The claim fails as a matter of law.  The complaint does not allege that the Rothfarb Defendants owed a fiduciary duty to Plaintiffs.  Furthermore, the Fidelity Defendants acted in accordance with court orders when they restrained the Indii account and deposited the funds of the account into the court registry during the interpleader action.  The complaint therefore fails to plausibly allege that the Fidelity Defendants engaged in any misconduct.  For these additional reasons, counts V and VI  fail to state a claim upon which relief can be granted.

### iv.   Counts VII & VIII: "Intentional Interference with Contractual Relations" and "Conspiracy to Interfere with Contractual Relations"

In count VII of the complaint, Plaintiffs charge the Defendants with "intentional interference

71

with contractual relations," alleging that Defendants "acted in concert to breach the contracts between FIDELITY and Plaintiffs."  Doc. [6-1] at ¶ 39.  Count VIII charges Defendants with conspiracy to commit the same.  To state a claim for intentional interference with contractual relationships, in New York, a plaintiff must establish (1) the existence of a valid contract between plaintiff and another contracting party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of breach of that contract by the other party, and (4) damages.  *Chace v. Bankers Trust Co.*, No. 89cv4497 (CSH), 1990 WL 33607, at *4 (S.D.N.Y. Mar. 22, 1990).  The claim fails as a matter of law against the Fidelity Defendants since "the overwhelming weight of authority in New York supports the view that a party to a contract cannot be liable for tortious interference with contractual relations as to that contract."  *CIBC Bank & Trust Co. V. Banco Cent. do Brasil*, 886 F. Supp. 1105, 1119 (S.D.N.Y. 1995).  The claim also fails against the Rothfarb Defendants as it does not allege either the existence of a contract, the Rothfarb Defendants' knowledge of a contract, the Rothfarb Defendants' intentional procurement of breach of a contract, or damages arising from the breach of a contract.  Accordingly, for these additional reasons, counts VII and VIII fail to state a claim upon which relief can be granted.

### v.     Counts IX - XIV: Extortion Claims

Counts IX through XII of the complaint sound in "extortion," "conspiracy to commit extortion," "attempted extortion," and "conspiracy to attempt extortion." Doc. [6-1] at ¶¶ 44 -55. *Id.* at ¶ 51. Those claims fail as a matter of law because civil extortion is not a cognizable cause of action under New York law.  *See, e.g., Kearney v. Kozloski*, No. 1:14cv1446 (GLS) (DEP), 2015 WL 500477, at *4 (N.D.N.Y. Feb. 3, 2015) (dismissing claim based on extortion under New York law because "extortion is a federal crime . . . and there is no cognizable civil counterpart").  The

claims for "attempted extortion" and "conspiracy to attempt extortion" alleged in counts XIII and

XIV against the Rothfarb Defendants also fail.  Like New York, Connecticut does not recognized

a claim for civil extortion.  *See Golden v. Hamer*, No. FST cv 085008396S, 2009 WL 3086417, at

*14 (Conn. Super. Ct. Aug. 25, 2009) (declining to recognize civil extortion as a new ground of

liability and granting defendants' motion to dismiss claim for civil extortion accordingly); *Hanssler*

*v. New Country Motor Cars of Greenwich, Inc*., No. FST cv 020192755S, 2005 WL 3046849, at *6

(Conn. Super. Ct. Oct. 19, 2005) (dismissing a claim for attempted extortion and holding "there is

no case law that provides a civil remedy for attempted extortion in violation of General Statute §

53a-119(5)(D) [of the Connecticut Penal Code]" (citation omitted)).  Counts IX through XIV

therefore fail to state a claim on the additional ground that civil extortion is not a viable cause of

action in Connecticut and New York.

## G.   <u>Leave to Replead</u>

For the several and various reasons stated in this Ruling, Plaintiffs' complaint must be

dismissed in its entirety as to all Defendants.

The remaining question is whether Plaintiffs should be given leave to replead.  The Second

Circuit has emphasized that "[a] *pro se* complaint is to be read liberally.  Certainly the court should

not dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives an indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d

Cir. 2000) (citations omitted).  Under Rule 15(a) of the Federal Rules of Civil Procedure, "a court

should freely give [leave to amend] when justice so requires."  Fed. R. Civ. P. 15(a).  However,

where repleading would be futile because the complaint suffers from substantive defects that could

not be cured by revising it, a request to replead should be denied.  *See Cuoco v. Moritsugu*, 222 F.3d

at 112; *see also Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied").

In this case, Plaintiffs' complaint suffers from substantive defects and obstacles that cannot be cured by revising or amending the pleading.  The claims asserted by the complaint are totally barred by the doctrines of res judicata or collateral estoppel.  Moreover,  personal jurisdiction does not lay over Shannon and Hoenig, counts I through XII against the Rothfarb Defendants are barred by the statute of limitations, and counts IX through XIV based on extortion allege a theory of recovery that is not recognized in Connecticut and New York as cognizable cause of action.  *See Kearney v. Kozloski*, 2015 WL 500477, at *4 n. 6 ("In this case, because plaintiff's civil extortion claim is not cognizable under either New York or federal law, I find that granting leave to amend would be futile.").

In the light of these authorities, Plaintiffs' complaint will be dismissed with prejudice, and without leave to replead.

## H.   <u>Future Actions</u>

Finally, we consider the Fidelity Defendants' request to enjoin Plaintiffs from filing any further claims against them.   In support of their argument for the issuance of a filing injunction, the Fidelity Defendants cite the following examples of Plaintiffs' "history of dishonesty," doc. [26] at 34: the New York State Supreme Court (Moskowitz, J.) "specifically held that 'Caro was not credible' and . . . showed a 'blatant disregard of' the corporate form," *id.* (quoting doc. [29-1]; the Connecticut Superior Court (Brazzel-Massaro, J.) found that Caro's "feigned ignorance [with respect to the issuance of the New York Judgment] was 'disingenuous'" in light of the fact that Caro had filed

a Notice of Appeal, *id.* (quoting doc. [29-7]); Caro executed "a financial affidavit . . . seeking spousal support from his late wife's estate" in which he did not reveal that he "'loaned'" $700,000 to Indii, *id.* (quoting or citing doc. [29-30]); Plaintiffs repeatedly argued to no avail that the August 2010 restraining notice was served "without leave of Court," *id.* at 35; and Plaintiffs have made conflicting representations to this Court and the United States District Court for the Southern District of New York about Indii's citizenship, *id*. The Fidelity Defendants also ask the Court to consider the "serious" charges of "'conspiracy,'" "'extortion'" and "'fraud'" as a factor in enjoining Plaintiffs from bringing against them future claims. *Id.*

"'[A] district court may, in its discretion, impose sanctions against litigants who abuse the judicial process.'" *Malcolm v. Bd. of Educ. of Honeoye Falls-Lima Cent. Sch. Dist.*, 506 F. App'x at 69 (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir.1996)). "Pursuant to that authority, a court may prevent a litigant from filing pleadings, motions or appeals upon a showing of extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation or a failure to comply with sanctions imposed for such conduct." *Id.* (citing *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987). "Specifically crafted sanctions are appropriate to restrain litigants who repeatedly exceed the bounds of tolerable litigation conduct." *Id.* (citing *In re Martin-Trigona*, 9 F.3d 226, 228 (2d Cir. 1993) (holding that a "leave to file" sanction is a reasonable requirement)). "Before a filing sanction is imposed, however, a litigant must be provided notice and an opportunity to be heard." *Id.* (citing *Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998)). "[I]n determining whether or not to restrict a litigant's future access to the courts, [the district court] should consider the following factors: (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive

in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties.  Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986).

Balancing those considerations, the Court is not persuaded that the Plaintiffs are shown to be the sort of "serial filers" who should be enjoined from filing future actions.  The Fidelity Defendants themselves concede that "Plaintiffs' litigations may not be as numerous as those of other serial plaintiffs . . . ."  Doc. [26] at 36.  The record reveals that Plaintiffs have filed  three actions against Fidelity — the FINRA arbitration, the lawsuit seeking to vacate the FINRA award, and the present action.  One of those actions — the lawsuit seeking to vacate the FINRA award — proved partially meritorious.  We concluded in that case that the FINRA arbitrators erred in awarding Fidelity $30,000 in attorneys' fees and vacated that portion of the award.  *Caro v. Fid. Brokerage Servs., LLC*, No. 3:12cv01066 (CSH), 2014 WL 3907920, *11-14 (D. Conn. Aug. 11, 2014).

Plaintiffs initiated other proceedings in these related litigations, but those proceedings do not weigh heavily in favor of a filing injunction.  In the Connecticut Superior Court (Brazzel-Massaro, J.), Caro moved, through counsel, against the Rothfarb Defendants to set aside the domesticated New York Judgment.  That motion was denied, but we cannot conclude that it was frivolous or vexatious.

76

Likewise, Caro also moved, through counsel, in the Connecticut Superior Court (Mottolese, J.) against the Rothfarb Defendants, seeking declaratory relief that the New York Judgment had been satisfied in full and an order directing Bill Rothfarb to discharge the judgment lien on Caro's property. The court denied Caro's request for declaratory relief, but ordered the Rothfarb Defendants to release the judgment lien. Docs. [39-4], [39-6]. Therefore, the action was partially successful. In any event, neither proceeding in Connecticut Superior Court was leveled against Fidelity.

It is true that in the present action, the FINRA confirmation lawsuit, and the FINRA arbitration, Plaintiffs advanced claims against the Fidelity Defendants that have proved unsuccessful and duplicative. But it is also true that all three of those actions were filed without the assistance of counsel, a factor which the Court of Appeals directs this court to considering in considering a request to enjoin a litigant from filing future lawsuits. Based on our discussion of the foregoing considerations, and on the present record, Fidelity's request for a filing injunction is denied.

Nonetheless, Plaintiffs' conduct has at times been problematic. They have pressed repetitive claims. They have made conflicting representations to this Court and the United States District Court for the Southern District of New York regarding Indii's citizenship. One court found Caro to be "not credible," doc. [29-1] at 4; another court found an argument he made to be "disingenuous," doc. [29-7] at 11. In this action, Plaintiffs bring claims that suffer from substantive deficiencies that cannot be cured by any amount of better pleading, in large part because they are barred by the doctrines of res judicata and collateral estoppel or the statute of limitations. Both sets of defendants have been obligated to defend against those claims and it has cost them time and perhaps money.

In those circumstances, the Court avails itself of this opportunity to advise Plaintiffs that the Court "will not look favorably upon any future attempt to resurrect already-dismissed claims and

already-dismissed defendants and may impose sanctions if Plaintiffs persist in seeking to do so."

*Sullivan v. Hyland*, 647 F. Supp. 2d 143, 157 (D. Conn. 2009) (internal quotation marks and citations omitted). This Court's order dismissing the complaint is of course an appealable order, and if Plaintiffs should persuade the Court of Appeals to take a different view of the case, such strictures would no longer apply. The Court does not question the sincerity with which Mr. Caro perceives himself to have been wronged, or the sincerity with which the individual defendants justify their conduct. The world is an imperfect place, and a court an imperfect place for remedying the world's imperfections. However, the rule of law binds litigants and courts alike. For the reasons stated in this Ruling, the Court concludes that the applicable rules of law mandate the dismissal of the complaint in this action.

### III.  CONCLUSION

For the reasons set forth above, Defendants' motions to dismiss are GRANTED. Accordingly, the complaint is dismissed as to all defendants, with prejudice, without costs, and without leave to replead.

The Clerk is directed to close the file.

It is SO ORDERED.

Dated:  New Haven, Connecticut
          April 30, 2015

          ___/s/ Charles S. Haight, Jr._____
          CHARLES S. HAIGHT, JR.
          Senior United States District Judge

78